250 November 25, 2020 No. 14

IN THE OREGON TAX COURT
REGULAR DIVISION

COMCAST CORPORATION
and Subsidiaries,
*Plaintiff,*

*v.*

DEPARTMENT OF REVENUE,
*Defendant.*

(TC 5265)

On cross-motions for summary judgment, the court considered multiple issues in light of the Oregon Supreme Court's decision that determined that "gross receipts from broadcasting" includes all gross receipts from activities in Plaintiff's regular course of business. *Comcast Corp. v. Dept. of Rev.*, 363 Or 537, 423 P3d 706 (2018). The first issue involved the Audience/Subscriber ratio defined in ORS 314.684(4). The court, after considering the text, context, and legislative history of the broadcaster apportionment statutes, determined that the "or" in "audience or subscribers" in the ratio's numerator included customers of any and all of Plaintiff's broadcasting activities, not merely customers of cable services. The second issue dealt with whether Plaintiff's sale of stock in three companies was apportionable to Oregon. The court concluded that, under the test expressed in *Allied-Signal, Inc. v. Director*, 504 US 768, 778, 112 S Ct 2251, 119 L Ed 2d 533 (1992), two of the stock sales were nonapportionable because the stock served an investment, rather than operational, function in Plaintiff's business. The third stock sale was left for later determination after further briefing because Plaintiff held a partnership interest in the entity. Another issue was whether Plaintiff could contest the Department of Revenue's adjustments to Plaintiff's net operating loss carryforward deductions. The court concluded that there had not been a determination on this issue in a prior proceeding; therefore, issue preclusion did not apply. The final issue concerned whether Plaintiff was required under ORS 317.314(1) to add back to its taxable income the amount it paid in Texas "margins" tax. The court found that the Texas tax was not a tax measured by "net income or profits" because it substantially limited deductions for typical business costs.

Oral argument on cross-motions for partial summary judgment was held October 2, 2019, in the courtroom of the Oregon Tax Court, Salem.

Gregory A. Chaimov, Davis Wright Tremaine LLP, Portland, filed the motion and Daniel H. Schlueter, Eversheds Sutherland (US) LLP, Washington D.C., argued the cause for Plaintiff.

Marilyn J. Harbur, Senior Assistant Attorney General, Department of Justice, Salem, filed the cross-motion and argued the cause for Defendant.

Decision rendered November 25, 2020.

**ROBERT T. MANICKE, Judge.**

## I.   INTRODUCTION

In these consolidated cases the parties present multiple substantive and procedural issues for summary judgment following the Oregon Supreme Court's resolution of one issue in *Comcast Corp. v. Dept. of Rev.*, 363 Or 537, 423 P3d 706 (2018). For reasons discussed below, the court first decides two motions for partial summary judgment filed by Plaintiff (taxpayer) relating, respectively, to the "audience/ subscriber ratio" component of the special sales factor for interstate broadcasters, and the classification of three sets of income items as either apportionable or nonapportionable. The court then decides the issues, to the extent not otherwise addressed, presented in a motion for summary judgment filed by Defendant Department of Revenue (the department). Those remaining issues relate to the composition of taxpayer's unitary group, the apportionability of certain income items, a claim for inclusion of certain receipts in the denominator of taxpayer's sales factor, taxpayer's carryforward deductions for net operating losses incurred in earlier years, the addback of taxes paid to other states, and computational issues relating to the Oregon Business Energy Tax Credit and certain penalties. The court begins with relevant procedural history of these cases.

### A.   *Procedural Background*

#### 1.   *The 2007-09 Case—No. TC 5265*

The Multistate Tax Commission (MTC) audited taxpayer for tax years 2007 to 2009 and, in April 2012, recommended various adjustments to taxpayer's Oregon corporation excise tax returns, the most significant of which were (1) an increase to taxpayer's Oregon apportionment percentage; and (2) a reclassification of certain items of taxpayer's income from nonbusiness to business. *See* ORS 305.655, Art VIII (allowing MTC member states to participate in interstate audits); ORS 305.675 (electing to participate).[1]

---

[1] Citations to the Oregon Revised Statutes (ORS) are to the 2007 edition unless otherwise indicated.

In mid-2012, the department issued notices of deficiency based on the MTC's determinations, resulting in an assessment of additional Oregon tax in the amount of $14,367,792. Taxpayer appealed in the Magistrate Division in 2014, and on November 23, 2015, the court specially designated the case for hearing in the Regular Division as case TC 5265 (the "2007-09 Case").

In 2016, the Regular Division issued a limited judgment in the 2007-09 Case on a threshold issue involving apportionment of taxpayer's taxable income as an interstate broadcaster under ORS 314.680 to 314.690, which the Supreme Court affirmed. *Comcast*, 363 Or 537, *aff'g* 22 OTR 295 (2016). The Supreme Court decided that, except for receipts from sales of real or tangible personal property, all gross receipts from transactions and activities in the regular course of taxpayer's trade or business—not solely receipts from "broadcasting" activities—constitute "gross receipts from broadcasting" and are included in the numerator of taxpayer's sales factor in the ratio that taxpayer's Oregon audience bears to its total audience. *Comcast*, 363 Or at 551.

### 2. *The 2010-12 Case—No. TC 5346*

Meanwhile, starting in 2014, the department conducted an audit of taxpayer for tax years 2010 to 2012 and made similar adjustments for those years resulting in notices of deficiency, dated July 24, 2015, assessing additional Oregon tax of $23,825,934. As in the 2007-09 Case, the two most significant issues were an increase to taxpayer's apportionment percentage and reclassification of certain income from nonbusiness to business. Taxpayer appealed in the Magistrate Division in 2017 (the "2010-12 Case"), and the magistrate granted taxpayer's unopposed motion to hold the 2010-12 Case in abeyance.

### 3. *Consolidation*

On October 2, 2018, the Supreme Court issued its appellate judgment in the 2007-09 Case. In October and November 2018, the parties resumed proceedings in the 2007-09 Case as to the remaining issues not covered by

the limited judgment. Upon the parties' joint motion, the Regular Division also reactivated the 2010-12 Case, specially designated it for hearing in the Regular Division as case TC 5346, and consolidated it with the 2007-09 Case.[2]

### 4.  *Parties' substantive motions; table of legal issues*

The following table sets forth the issues, in the order covered below, identifying which party has moved, and with cross-reference to the claims identified in each of taxpayer's complaints.[3]

## Table of Legal Issues

| Issue 2007-09 | | Claim No. in Complaint | | Which Party's Motion Applies | |
|---|---|---|---|---|---|
| | | 2010-12 | Tax-payer | Depart-ment | |
| A | Audience/ Subscriber Ratio | VII | VI | Plaintiff's Motion for Partial Summary Judgment (Apportionment – Audience Factor Issue) | None |
| B | Apportionabil-ity of Dividends and Gain from Vodafone, Time Warner and A&E | II, III, IV | I, II, III | Plaintiff's Motion for Partial Summary Judgment (Business / Nonbusiness Income Issue) | Defendant's Motion for Summary Judgment ("Def MSJ"), §§ III.B. and III.C |

---

[2] On November 17, 2020, the court granted the parties' joint petition to specially designate taxpayer's appeal for tax years 2013, 2014, and 2015 for hearing in this division (the "2013-15 Case"). The parties represented that the claims in the 2013-15 Case are substantially similar to those in the 2007-09 and 2010-12 Cases, and that the court's decision in those Cases is likely to resolve or substantially narrow the issues in dispute in the 2013-15 Case. On the parties' joint motion, the court ordered the 2013-15 Case held in abeyance pending the resolution of the 2007-09 and 2010-12 Cases. To date, the 2013-15 Case is not consolidated with the 2007-09 and 2010-12 Cases.

[3] A similar table, shown in order of taxpayer's claims, appears on page 2 of Plaintiff's Response to Defendant's Motion for Summary Judgment.

| C | Composition of Unitary Group (Comcast MO Financial Services, Inc.) | I | | None | Def MSJ, § III.A. |
|---|---|---|---|---|---|
| D | Apportionability of Other Income Items | II, III, IV | I, II, III | None | Def MSJ, §§ III.B., III.C, III.D. |
| E | Sales Factor Relief | V | IV | None | Def MSJ, § III.E. |
| F | Net Operating Loss Carryforward Deductions | VIII | VII | None | Def MSJ, § III.F. |
| G | Deduction/ Addback of Tax Paid to Other States | | VIII | None | Def MSJ, § III.G. |
| H | Business Energy Tax Credit | | IX | None | Def MSJ, § III.H. |
| I | Penalties | IX | X | None | Def MSJ, § III.*I.* |
| — | Costs of Performance/ Definition of "Gross Receipts from Broadcasting" | VI | V | Decided in Supreme Court Appeal | |

The department moved for summary judgment on August 1, 2019. Its motion covers each of taxpayer's claims except taxpayer's audience or subscriber ratio claim. On the same day, taxpayer filed two cross-motions for partial summary judgment. Taxpayer's first motion addresses the audience or subscriber ratio, which is used in determining the percentage of taxpayer's taxable income that is apportioned to Oregon under the statutory regime for interstate broadcasters in ORS 314.680 to 314.690 as recently construed by the Supreme Court. The department opposes taxpayer's first cross-motion but, as noted, has not filed its own motion on the issue. In addition to its substantive objections, the department urges the court to deny the motion as to tax years 2007 to 2009 on the ground that taxpayer's asserted computation method does not relate to any claim in taxpayer's complaint for those tax years. Taxpayer's second cross-motion

addresses the department's characterization of certain gain and dividends as apportionable business income. Together, taxpayer's two cross-motions address the great majority of the dollar amount of the tax deficiency the department has assessed. Taxpayer opposes the department's motion as to all remaining issues.

### 5.   *Taxpayer's motion to strike*

The department's motion for summary judgment includes a 42-page section entitled "Facts," of which approximately 35 pages are what the department describes as "facts *** taken from the MTC Audit Report[.]"[4] This content is a verbatim excerpt of the MTC auditor's "findings and conclusions" upon the completion of his audit for tax years 2007 through 2009. It describes transactions and other events in taxpayer's history, interspersed with conclusions about their legal significance. A substantial part of the content consists of unattributed quotations with no attempt to identify the source. Although the department contends that the "auditor relies heavily on excerpts from plaintiff's own 10-Ks," there is no way to tell to what extent the auditor relied on any source. The court finds it impossible to separate purported facts from the subjective impressions, conclusions, or inferences formed by the auditor or persons to whom the auditor may have been referring. Ignoring all evidentiary concerns, the court finds the MTC Excerpt devoid of reliable content or persuasive value. Taxpayer objects to the department's characterization of the MTC Excerpt as factual, asserts that it is inadmissible hearsay incapable of supporting summary judgment, and asks the court to "strike" the MTC Excerpt.[5] The court agrees with taxpayer that the MTC Excerpt is inadmissible hearsay. OEC 801. The MTC Excerpt therefore

---

[4] The court uses the term "MTC Excerpt" to denote the text at page 4, line 14, through page 39, line 22, in Defendant's Motion for Summary Judgment, as well as the text at page 1, line 16, through page 37, line 3, in the Declaration of Paul G. Mond dated September 12, 2019.

[5] The department originally simply reprinted the MTC Excerpt in the facts section of its motion. After taxpayer objected under TCR 47, the department filed a declaration of the MTC auditor that reprints the same excerpt. However, the declaration makes no effort to address the deficiencies in the substantive content; the auditor simply authenticates the excerpt as "an excerpt from my MTC Audit Report findings and conclusions from my MTC Audit Report." The auditor's authentication of the MTC Excerpt does not make it admissible.

does not support the department's motion. *See* Tax Court Rule (TCR) 47 D ("declarations must be made on personal knowledge, must set forth such facts as would be admissible in evidence, and must show affirmatively that the \*\*\* declarant is competent to testify to the matters stated therein"). The court regards the MTC Excerpt as nothing more than a statement of the department's litigation position in this case.

In response to taxpayer's motion to strike, the court will decline to admit the MTC Excerpt into evidence.[6]

## B. *Standard of Review*

The court grants a motion for summary judgment only if "the pleadings \*\*\* declarations, and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to prevail as a matter of law." TCR 47 C. *See United Streetcar, LLC v. Dept. of Rev.*, 23 OTR 418, 426 (2019) (slip op at 10-11) (citing *Two Two v. Fujitec America, Inc.*, 355 Or 319, 331, 325 P3d 707 (2014)). The party moving for summary judgment has the burden of demonstrating that there are no material issues of fact and that it is entitled to judgment as a matter of law. *McKee v. Gilbert*, 62 Or App 310, 321, 661 P2d 97 (1983). The court must view the evidence and all reasonable inferences it may support in the light most favorable to the nonmoving party. The nonmoving party has the burden of producing evidence, including by affidavit or declaration, on any issue raised in the motions as to which the moving party would have the burden of persuasion at trial. *See, e.g.*, *Hagler v. Coastal Farm Holdings, Inc.*, 354 Or 132, 142, 144-45, 309 P3d 1073 (2013) (nonmoving party—an injured customer—had the burden on summary judgment to produce evidence sufficient to create a genuine issue of material fact that the moving party—a business owner—"knew or should have known" that the manner in which it shelved certain merchandise posed a danger to customers) (citation omitted).

---

[6] The court observes that, in its briefing filed after its original motion, the department bases its arguments largely on taxpayer's public filings with the Securities and Exchange Commission, rather than on the MTC Excerpt.

C.  *Legal Background Related to Apportionment for Inter-state Broadcasters*

Each of the first five issues listed above (Issues A through E) relates in some way to the concept of "apportionment," which in this context refers to a formulaic approach to determine the share of income of a multistate taxpayer that any one state may tax under the Due Process and Commerce Clauses of the United States Constitution. Apportionment may be contrasted with "allocation," which generally refers to the assignment of a specific item of income or loss to a particular state. As the United States Supreme Court has explained:

> "Because of the complications and uncertainties in *allocating* the income of multistate businesses to the several States, we permit States to tax a corporation on an *apportionable* share of the multistate business carried on in part in the taxing State. That is the unitary business principle."

*Allied-Signal, Inc. v. Director*, 504 US 768, 778, 112 S Ct 2251, 119 L Ed 2d 533 (1992) (emphases added); *see Tektronix, Inc. v. Dept. of Rev.*, 354 Or 531, 536-37, 316 P3d 276 (2013) (explaining concepts of allocation and apportionment).

During the 1960s, many states, including Oregon, adopted a uniform law governing the apportionment and allocation of income, known as the Uniform Division of Income for Tax Purposes Act (UDITPA).[7] One function of UDITPA is to define what income must be apportioned or allocated. UDITPA applies the label "business income" to refer to income the statute treats as apportionable. *See* ORS 314.610(1) (defining business income as "income arising from transactions and activity in the regular course of the taxpayer's trade or business and includes income from tangible and intangible property if the acquisition, the management, use or rental, and the disposition of the property constitute integral parts of the taxpayer's regular trade or business operations"); ORS 314.647 - 314.670 (prescribing apportionment method for business income). The UDITPA label "nonbusiness income" refers to a collection of specific types of income

---

[7] Oregon adopted UDITPA in 1965. *See* Or Laws 1965, ch 152, codified at ORS 314.605 - 314.670; *see generally Health Net, Inc. v. Dept. of Rev.*, 362 Or 700, 704-05, 415 P3d 1034 (2018).

items that must be allocated to a particular state. *See* ORS 314.610(5) ("'Nonbusiness income' means all income other than business income."); ORS 314.625 - 314.645 (identifying state to which various items of nonbusiness income must be allocated). The United States Supreme Court has stated: "In the abstract, [the UDITPA] definitions may be quite compatible with the unitary business principle." *Allied-Signal*, 504 US at 786. The Court, however, has not adopted the UDITPA definitions as coextensive with the constitutional test in all respects; accordingly, this court generally uses the terms "apportionable" and "allocable" in discussing the parties' constitutional arguments and the terms "business income" and "nonbusiness income" in discussing arguments under UDITPA.

Another main function of UDITPA is to prescribe the formula for apportioning apportionable income. The original UDITPA formula relied on the relative value of the taxpayer's in-state property, payroll, and sales, compared to property, payroll, and sales everywhere. Since 2005, however, Oregon's apportionment formula simply uses sales (gross receipts) as its sole "factor." *See* Or Laws 2005, ch 832, § 49. The factor is a fraction, often expressed as a percentage. For the Years at Issue, apportionable "business" income is multiplied by the fraction consisting of taxpayer's sales in Oregon divided by its sales everywhere. ORS 314.650(1) ("All business income shall be apportioned to this state by multiplying the income by the sales factor."); ORS 314.665(1) ("[T]he sales factor is a fraction, the numerator of which is the total sales of the taxpayer in this state during the tax period, and the denominator of which is the total sales of the taxpayer everywhere during the tax period.").

For an interstate broadcaster, ORS 314.684 prescribes a unique and somewhat more complex method to compute the sales factor.[8] Under subsection (2) of ORS 314.684, the denominator of the sales is the total gross receipts from transactions and activities in the regular course of the broadcaster's trade or business. Under subsection (3), the

---

[8] Apart from the sales factor, the other provisions of Oregon's UDITPA generally apply to interstate broadcasters in the same manner as to other taxpayers. *See* ORS 314.682(2).

numerator of the sales factor includes all gross receipts attributable to Oregon under regular UDITPA provisions, except that "gross receipts from broadcasting" must be included in the numerator of the sales factor as specified in subsection (4). Subsection (4) introduces a second fraction that resides within the numerator of the sales factor. To calculate the sales factor numerator, the broadcaster is required to multiply gross receipts from broadcasting by a fraction, which the court refers to as the "Audience/Subscriber Ratio." The numerator of the Audience/Subscriber Ratio is the interstate broadcaster's "audience or subscribers located in this state," and the denominator is the "total audience and subscribers located both within and without this state." ORS 314.684(4). The complete sales factor for an interstate broadcaster can be expressed as follows, with the Audience/Subscriber Ratio shown in shading:

$$\frac{\text{Gross receipts from broadcasting} \times \dfrac{\text{Audience or subscribers in Oregon}}{\text{Total audience and subscribers}} + \text{All other gross receipts attributable to Oregon}}{\text{Total gross receipts from transactions and activities in the regular course of business} - \text{Any receipts excluded under Department rules}}$$

The Supreme Court proceedings in the 2007-09 Case resolved the question of which receipts are considered "gross receipts from broadcasting": all receipts from transactions and activities in the regular course of taxpayer's trade or business, except those from sales of real or tangible personal property. The parties now disagree about how to determine the Audience/Subscriber Ratio.

The statute defining "interstate broadcaster" states: "The audience or subscribers ratio shall be determined by rule of the Department of Revenue." ORS 314.680(3). The department has adopted such a rule,[9] and each party

---

[9] At all relevant times, OAR 150-314-0465 (which until 2016 was numbered as OAR 150-314.684(4)) provided:

"(1) In general, if a taxpayer broadcasts to subscribers or to an audience that is located both within and without this state and the broadcaster is taxable in another state under the provisions of ORS 314.620, then the interstate broadcaster is required to use an audience factor to determine the amount of gross receipts from broadcasting attributable to this state.

"(2) The audience factor for television, radio, or network programming shall be determined by the ratio that the taxpayer's in-state viewing or listening audience bears to its total United States viewing or listening audience. In the case of television, the audience factor shall be determined by reference to the rating statistics as reflected in such sources as Arbitron, Nielsen or other comparable resources or by the average circulation statistics published annually in the Television and Cable Factbook, 'Stations Volume' by Television Digest, Inc., Washington, D.C., provided that the source selected is consistently used from year to year for such purpose. In the case of radio, the audience factor shall be determined by reference to rating statistics as reflected in such sources as Arbitron, Birch/Scarborough Research, or other comparable resources, provided that the source selected is consistently used from year to year for such purpose.

"(3) If none of the forgoing sources are available, or if available, none is in form or content sufficient for such purposes, then the audience factor shall be determined by the ratio that the population of the broadcast area located within this state bears to the population of the broadcast area in all states.

"(4) Gross receipts from live telecasts and films in release to or by a cable television system shall be attributed to this state in the ratio (hereafter 'audience factor') that the number of subscribers located in this state for such cable television system bears to the total number of subscribers of such cable television system in the United States. If the number of subscribers cannot be accurately determined from the records maintained by the taxpayer, the audience factor ratio shall be determined on the basis of the applicable year's subscription statistics published in Cable Vision, International Thompson Communications, Inc., Denver, Colorado, if available, or, if not available, by other published market surveys.

"(5) If none of the foregoing resources are available, or, if available, none is in form or content sufficient for such purposes, then the audience factor shall be determined by the ratio that the population of the area served by the cable system service located within this state bears to the population of the area served by the cable system in all states in which the cable system has subscribers.

"(6) To the extent that the gross receipts from such live television broadcasting, film, or radio programming, as determined pursuant to paragraphs (2) through (5), include receipts derived from broadcasts to audiences located outside the United States ('foreign-based receipts'), the total gross receipts against which the audience factor shall be applied shall be modified so that such foreign-based receipts are not used to affect the amount of receipts that are to be apportioned to the state. Such modification shall consist of

asserts that its method of determining the Audience/ Subscriber Ratio complies with the rule and that the other party's method does not. However, the basic elements of the Audience/Subscriber Ratio are stated in ORS 314.684(4), which provides:

> "Gross receipts from broadcasting of an interstate broadcaster which engages in income-producing activity in this state shall be included in the numerator of the sales factor in the ratio that the interstate broadcaster's audience or subscribers located in this state bears to its total audience and subscribers located both within and without this state."

Both parties base their arguments on the underlying statutes, principally ORS 314.684(4), and neither party asserts that the rulemaking authority in ORS 314.680(3) authorizes the department to promulgate a rule contrary to the terms of ORS 314.684(4). The court, therefore, analyzes the Audience/Subscriber Ratio issue as a matter of interpretation of the underlying statutes before turning to analysis under the department's rule.

## II.  ISSUES

A.  *Taxpayer's Motion: Audience/Subscriber Ratio Under Interstate Broadcaster Apportionment Law*

1.  *Facts (Issue A)*

Unless otherwise indicated, the following uncontested facts are recited in taxpayer's brief, with citations to

---

deducting from total receipts, prior to the application thereto of the audience factor, that amount of receipts derived from broadcasts to audiences located outside the United States.

"Example: XYZ Television Network Co. has gross receipts from all broadcasting of films of $1 billion of which a total of $200,000,000 was derived from advertising receipts and license fees attributable to releases of its films in foreign television markets and $800,000,000 attributable to the United States market. Assume that the foreign countries into which its programming has been telecast or sold or licensed for telecast would have jurisdiction to impose their income tax upon XYZ Television Network Co., then its in-state gross receipts attributable to its telecasting activity would be determined as follows: $1,000,000,000 − $200,000,000 ($800,000,000) = (audience factor).

"(7) Receipts from the sale, rental, licensing or other disposition of audio or video cassettes, discs, or similar medium intended for home viewing or listening shall be included in the sales factor as provided in OAR 150-314-0429 and 150-314-0431."

underlying declarations and documents. Tables in taxpayer's brief show its computations.

During all of the tax years at issue, taxpayer provided cable television, internet access, and telephone service. It also operated a group of national television networks and regional sports and news networks, including E! Entertainment Television, The Golf Channel, and others. Taxpayer also owned and operated a professional hockey team (the Philadelphia Flyers) and a multipurpose arena (the Wells Fargo Center in Philadelphia).

In 2011, the year before the MTC completed its audit of tax years 2007-09, taxpayer closed a transaction with the General Electric Company (GE) that resulted in taxpayer acquiring a 51 percent controlling interest in NBCUniversal, LLC (NBCU).[10] The acquisition expanded the number of television networks that taxpayer owned and operated to 29, adding the NBC Television Network, the USA Network, CNBC, and others. The acquisition of NBCU also gave taxpayer ownership of a movie studio (Universal Pictures), and NBCUniversal-branded theme parks in Florida and California. For financial reporting purposes, taxpayer's Annual Report on Form 10-K for 2012 organized taxpayer's business into five reportable business segments: (1) cable communications; (2) cable networks; (3) broadcast television; (4) filmed entertainment; and (5) theme parks.[11]

---

[10] A more complete description of the transaction appears below in the discussion of Issue B, the Apportionability of Dividends and Gain from Vodafone, Time Warner, and A&E.

[11] Taxpayer's 2012 Annual Report on Form 10-K describes the business segments as follows:

"Cable Communications: Consists of the operations of Comcast Cable, which is the nation's largest provider of video, high-speed Internet and voice services ('cable services') to residential customers under the XFINITY brand, and we also provide these services to businesses.

"Cable Networks: Consists primarily of our national cable networks, our regional sports and news networks, our international cable networks, our cable television production studio, and our related digital media properties.

"Broadcast Television: Consists primarily of the NBC and Telemundo broadcast networks, our NBC and Telemundo owned local broadcast television stations, our broadcast television production operations, and our related digital media properties.

Taxpayer seeks to compute its sales factor using data from two of its business segments: broadcast television and cable networks, and taxpayer includes in its briefing and declarations further detail about the origin of its receipts from those segments.

*Taxpayer's Television Networks.* During all of the years at issue, taxpayer's television networks were transmitted to audiences in three primary ways: (i) via over-the-air broadcasts (in the case of the NBC television network); (ii) via cable television to persons who subscribed to taxpayer's cable systems as well as to subscribers to other cable systems such as Charter Communications; and (iii) via direct broadcast satellite (DBS) to subscribers to those systems, including DISH Network and DirecTV. In general, taxpayer's cable systems accounted for only a minority of the networks' total subscribers. For example, during 2007, taxpayer's most widely distributed network was E! Entertainment Television (E!). It had 82,175,289 total subscribers, of which 21,174,734 (*i.e.*, 25.8 percent) were taxpayer cable subscribers.

Taxpayer's television networks generated revenues from two primary sources—license fees and advertising. Both of these revenue streams were dependent on the size of each network's audience. License fees were paid on a per-subscriber basis (*e.g.*, $0.25 per subscriber, $0.50 per subscriber, etc.) by the cable and DBS companies that distributed those networks. The per-subscriber rates varied depending on the network, its popularity, and other factors. In the case of advertising revenues, the amounts that advertisers were willing to pay depended in part on the number of subscribers who received the network. Because payments to taxpayer depended on the number of network subscribers, taxpayer kept detailed records of the number of subscribers for each of its owned networks.

---

"Filmed Entertainment: Consists primarily of the operations of Universal Pictures, which produces, acquires, markets and distributes filmed entertainment worldwide.

"Theme Parks: Consists primarily of our Universal theme parks in Orlando and Hollywood."

Beginning in 2011, with taxpayer's acquisition of the NBCUniversal television networks, the NBC television network became taxpayer's most widely distributed network. The NBC television network is available to virtually every television household in the United States. Consequently, unlike the years 2007 to 2010, beginning in 2011 and 2012, there was complete overlap between taxpayer's most widely distributed network (NBC) and taxpayer's other networks. There were no households or subscribers that received one of taxpayer's other networks but did not receive NBC.

*Taxpayer's Cable Television Service.* In addition to operating the television networks listed above, taxpayer also provided cable television service to subscribers in Oregon and other states. During the years 2007 through 2010, the vast majority of taxpayer's cable subscribers also subscribed to one or more of taxpayer's television networks. During the years 2007 through 2010, however, taxpayer's most basic level of cable service (Basic) did not include any of taxpayer's owned and operated networks—for example, E!, The Golf Channel, etc. Therefore, during those years, taxpayer's cable television customers who only received Basic cable were not subscribers to any of taxpayer's television networks.

Beginning in 2011, with taxpayer's acquisition of the NBCUniversal networks, there were no longer any subscribers to taxpayer's cable television service who failed to receive at least one taxpayer network. This is because the NBC television network is included in taxpayer's Basic level of service. Thus, beginning in 2011, all of taxpayer's cable television subscribers also subscribed to at least one of its networks.

2. *Issue (A)*

Does taxpayer's method to compute the Audience/ Subscriber Ratio comply with ORS 314.684?

3. *Analysis (Issue A)*

The Audience/Subscriber Ratio divides the Oregon "audience or subscribers" by the total "audience and subscribers." ORS 314.684(4). The parties do not disagree about whether particular audience members or subscribers are

located in Oregon. They disagree about how to account for persons who may be part of the "audience" of programming, either because they "subscribe" to a particular "network" of television programming that they receive by cable or satellite, or because they receive that programming over the air; or who "subscribe" to taxpayer's cable television service; or who act in some combination of these roles.

Taxpayer's premise is that the ratio by which it must multiply its "gross receipts from broadcasting" is required to consist of a numerator comprising its Oregon audience and subscribers for all of taxpayer's activities constituting "broadcasting," and a denominator comprising its audience and subscribers within and without Oregon for all of taxpayer's activities constituting broadcasting. Taxpayer has identified two activities that constitute broadcasting: operating television networks and providing cable television service. To determine its audience for television networks broadcast over the air (NBC), taxpayer has used Nielsen data. In the case of taxpayer's other television networks (E!, CNBC, the USA Network, etc.) broadcast over taxpayer's cable service, or taxpayer's television networks broadcast over cable or satellite services provided by others, taxpayer has determined the relative number of "subscribers" to each network. After eliminating duplicates among persons who are in the audience of, or are subscribers to, multiple networks, taxpayer uses the sum of unique Oregon audience members and subscribers in the numerator, and the sum of unique nationwide audience members and subscribers in the denominator.

More specifically, taxpayer has determined the numerator of its Audience/Subscriber Ratio as the sum of (i) the Oregon audience and subscribers who received one or more of taxpayer's television networks by whatever means; and (ii) the Oregon audience and subscribers who received taxpayer's cable service but did not receive any of taxpayer's networks.[12] In determining the first number (the audience and subscribers that received one or more of taxpayer's television networks), taxpayer used two sets of data: (a) for the

---

[12] Taxpayer's denominator is the same, except that it includes the total audience and subscribers within and without Oregon.

over-the-air network (NBC), annual reports prepared by the Nielsen Company; and (b) for all other networks, the relative number of subscribers.[13]

In tallying the numbers above, taxpayer sought to count each audience member or subscriber only once, by using a "build-up" approach. Under the build-up approach, taxpayer started with (1) the audience (or subscribers) of its most widely distributed broadcasting service (E! in 2007 to 2009; NBC in 2010 to 2012); then (2) added the subscribers to taxpayer's other networks who were not already included in (1); and finally (3) added the subscribers to taxpayer's cable service not already included in (1) or (2). Taxpayer argued that, under this method (including the arithmetically equivalent "reverse build-up" method), no household or subscriber is counted twice. Taxpayer also presented computations indicating that a methodology that summed individual audiences or subscribers for its various networks and its cable service would yield very similar results. The department disagrees with taxpayer's computation method as discussed below, but the department does not dispute the accuracy of the data on which taxpayer relies.

The department's main objection is premised on characterizing taxpayer as a "cable company." In its briefing, the department asserts that "Comcast cannot dispute that it is a cable company."[14] At oral argument, the department took a slightly different approach, asserting that taxpayer was "*primarily* engaged in *subscription* activity." (Emphasis added.) Based on this premise, the department argues that taxpayer was required to use only the number of subscribers to its own cable services to generate the numerator and denominator of its ratio, without regard to any indicators of the audience for taxpayer's other activities that also constitute "broadcasting."

---

[13] DBS "subscriber" numbers actually are estimates based on Nielsen data because the DBS companies do not release actual subscriber numbers by state.

[14] The department goes on to state, without citation: "That determination was made by this court in deciding that Comcast was an interstate broadcaster." However, the department fails to explain what it means by the term "cable company" or why such a finding would have been necessary at any prior stage of this litigation. This court and the Supreme Court at times *referred* to taxpayer as a cable company, but this court has found no "determination" on that point.

As a factual matter, the department does not dispute that, even during tax years 2007 through 2009 when taxpayer derived the overwhelming portion of its revenue from its "cable" business segment,[15] taxpayer also operated television networks that supplied content (the E! network, The Golf Channel, regional sports programming, etc.), both over taxpayer's own cable system and by license to other cable companies and satellite broadcasting companies. Nor does the department dispute that the proportion of taxpayer's activities devoted to operating television networks increased dramatically with the acquisition of NBCU, accounting for approximately 46 percent of taxpayer's revenue in 2012.[16]

As a legal matter, the department acknowledges that taxpayer's operating of television networks constituted broadcasting. (Department admits that "Comcast's television network operations constituted 'broadcasting' within the meaning of ORS 314.680(1) ***.") The statutory basis for the department's position that taxpayer's Audience/Subscriber Ratio must be limited to its subscribers to cable services seems to derive from the word "or" in ORS 314.684(4). The statute provides:[17]

> "Gross receipts from broadcasting of an interstate broadcaster which engages in income-producing activity in this state shall be included in the numerator of the sales factor in the *ratio* that the interstate broadcaster's *audience or subscribers* located in this state bears to its total *audience and subscribers* located both within and without this state."

---

[15] Taxpayer's 2007 Form 10-K provides: "Our Cable segment, which generates approximately 95% of our consolidated revenues, manages and operates our cable systems, including video, high-speed Internet and phone services ('cable services'), as well as our regional sports and news networks. Our Programming segment consists primarily of our consolidated national programming networks, including E!, The Golf Channel, VERSUS, G4 and Style." (Uppercase in original.)

[16] The department does assert at one point that a genuine issue of material fact exists because taxpayer "refused to provide" its actual subscriber numbers for the years 2010 to 2012. Taxpayer, however, responded that it had provided the requested data and cited its responsive document by date and Bates number. The department did not respond to this point, and the court considers it resolved in favor of taxpayer.

[17] The department's brief discusses only its arguments based on legislative history. The department advanced its text-based argument focusing on the word "or" for the first time at oral argument.

ORS 314.684(4) (emphasis added). The court understands the department to argue that the reference to audience "or" subscribers indicates that the legislature intended to require a "cable company" (a term not used in the statute) to determine its ratio solely based on the relative number of its cable service subscribers in Oregon, even if the company also broadcasts over the air, by satellite, and by licensing its programming to other cable service providers.

The court reviews the department's argument applying the framework of *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). The department has offered no discussion of statutory text or context, but it seems to assert that "or" is restricted to its disjunctive meaning: A broadcaster must use a ratio of audience or subscribers, but not a mix of both. However, the Oregon Supreme Court has rejected the notion that "or" always is disjunctive; "or" may have an "inclusive" meaning, depending on the context. *See Burke v. DLCD*, 352 Or 428, 435-36, 290 P3d 790 (2012). Here, the context, although not entirely clear, tilts in favor of an inclusive meaning. In the same sentence of subsection (4), the legislature required the numerator of "audience or subscribers" to be divided by a denominator of "audience *and* subscribers" (emphasis added). The department fails to explain why the audience and subscribers can be combined in the denominator of the ratio but not in the numerator. The court concludes that the use of "and" for the denominator confirms that the legislature intended "or" for the numerator to have an inclusive meaning.[18] The court concludes further that the

---

[18] As further context, the court notes that the definition of "interstate broadcaster" in ORS 314.680(3) uses "or" in a way similar to the description of the numerator in ORS 314.684(4):

"'Interstate broadcaster' means a taxpayer that engages in the for-profit business of broadcasting to subscribers or to an audience located both within and without this state."

ORS 314.680(3). The court concludes that this sentence does not resolve the issue; it is simply an additional ambiguous use of the word "or." The next sentence provides:

"The audience or subscribers ratio shall be determined by rule of the Department of Revenue."

ORS 314.680(3). While this sentence could imply that the legislature intended that a ratio would consist either exclusively of audience numbers in both the numerator and denominator, or exclusively of subscriber numbers in both the numerator and denominator, the text of the sentence does not rule out the

statutory text and context do not support the department's position that the legislature intended to require cable companies to determine their ratio solely by the relative number of subscribers to their cable services.

The department asserts that the legislative history "demonstrates that cable companies like Comcast are subject to apportionment based on their subscriber ratio, not their audience." The passages of legislative testimony that the department quotes, however, make only the general point that the legislature included the word "subscribers" in order to establish that cable service providers are within the definition of "broadcaster." For example, Jim Gardner, the principal witness for the broadcasting industry, testified:

> "We've added a reference at the Department's request to 'subscribers' to make sure it was clear from the definition of 'broadcasting' that this did apply to cable. That reference is picked up in 'interstate broadcaster' by reference to the words 'and subscribers' * * *."

(Testimony of Jim Gardner, House Committee on Revenue and School Finance Work Session on HB 2226 (May 15, 1989), Cassette 143, Side A 27-164.) This passage, and the others the department cites, say nothing about the possibility that a cable company might also broadcast by other means, and the court finds nothing in the legislative history suggesting that a business that conducts any, or even most, of its broadcasting by cable must derive its ratio exclusively from its cable subscribers.[19]

---

possibility of a mix of both. As with ORS 314.684(4), the court concludes that the use of "total audience *and* subscribers" in ORS 314.684(4) (emphasis added) resolves the ambiguity in favor of reading "or" inclusively.

[19] The court notes its interpretation of the following colloquy, a portion of which is excerpted in the department's response brief:

"[Senator Timms:]  Madam Chair?

"[Chair:]  Senator Timms.

"[Senator Timms:]  Would you define for me, I don't have the broadcaster defined here, would that include cable? Is that strictly where the program originates from originally?

"[Department representative Strauss:]  Madam Chair, Senator Timms, that, that's correct. Subscribers are the cable television companies and they're ...

"[Senator Timms:]  So they would be included in this?

"[Strauss:]  That's right.

Indeed, requiring an over-the-air broadcasting audience to be determined based on cable subscribers seems outright inconsistent with the choices legislators heard about and discussed in their committee hearings. At a high level, the legislature's purpose in enacting ORS 314.680 to 314.690 was to find a way to account for the location of the market in the sales factor of interstate broadcasters. Specifically, legislators were concerned that the state of Washington had recently adopted a market-based approach that purported to impose sales tax on Oregon broadcasters measured by their share of revenues from advertising directed at the Washington market. (Oregon legislators were concerned with the effect of recently passed Washington law. "[Washington has] just adopted a reg. on their sales tax *** so that *** if an advertiser is using media to make sales into Washington State *** Washington State is now going to grab those sales and impose sales and use tax on them.") Meanwhile, existing Oregon law applied the costs-of-performance rules under Oregon's version of UDITPA, with the result that an over-the-air broadcaster based in Oregon typically included 100 percent of its advertising revenue in the numerator of its Oregon sales factor because it incurred the greater proportion of its costs in Oregon. *See* ORS 314.665(3)(1987) ("Sales, other than

---

"[Senator Timms:] So, you could have a cable company in Boise, Idaho, transmits something into Oregon, that would not be, they would not be taxed on that? While if you had a broadcaster that the program originated with and then came into Oregon he would be taxed?

"[Strauss:] Well, the cable company would be taxable as well. Because they're, they're broadcast into the state is through the cable, and so then we look at their subscribers for their audience.

"[Senator Timms:] *Okay, anything that's broadcasted through, through that feed.*

"[Strauss:] *Right, through radio or through television airways or the coaxial cables.*

"[Chair:] Further questions? ***"

One possible interpretation of the italicized language is that anything that a cable company broadcasts "through radio or through television airways or the coaxial cables" must be apportioned based on the cable company's subscribers. The department does not specifically argue for this interpretation, and the court rejects any such interpretation. Reading the entire colloquy, the court finds that the more persuasive interpretation is that the department's representative Strauss was answering affirmatively Senator Timms's question whether the definition of "broadcaster" includes not only an over-the-air radio or television broadcaster, but also a cable company. The court does not interpret Strauss's response as referring to a cable company that also broadcasts over the air.

sales of tangible personal property, are in this state if * * * the income-producing activity is performed both in and outside this state and a greater proportion of the income-producing activity is performed in this state than in any other state, based on costs of performance."). Absent a change to Oregon law, such an Oregon-based broadcaster would, roughly speaking, be required to pay tax to both states on the same advertising revenues attributable to the Washington market. Over the course of the legislative session, the bill was amended to also ensure that a broadcaster based *outside* Oregon would (assuming it had nexus with Oregon) be required to include an amount in its sales factor reflecting the value of the Oregon audience to advertisers, as opposed to having *no* sales attributed to Oregon under the cost-of-performance rules. Similarly the legislators concluded: "As redrafted the bill is essentially a two way street so that if there is nexus on the part of an out of state broadcaster or a network you will be able to use the new audience factor apportionment to apportion the sales of that out of state entity."

Nearly all discussion of specific situations or hypotheticals involved either over-the-air broadcasters or "the three networks," including NBC and ABC. The statutory references to "subscribers" appear to have been an afterthought. Discussion of this was included in the department's legislative history: "We've added a reference at the department's request to 'subscribers' to make sure it was clear from the definition of 'broadcasting' that this did apply to cable."[20] The legislature appears to have considered "subscribers," for a cable company, as a stand-in or substitute for the audience of an over-the-air broadcaster. Legislators do not appear to have considered the possibility that a single company might

---

[20] One reason cable companies attracted little attention from the legislative committee members is that cable companies had little cause for complaint. The bill did not materially affect their Oregon tax burden because their on-the-ground cable operations in Oregon gave them "costs of performance" in Oregon under UDITPA; therefore, any cable company already had an Oregon sales factor greater than zero. Discussion of this was included in the department's legislative history: "[W]e have had no objections from the cable companies to this, primarily because it's our understanding that the cost of performance method * * * and the audience factor method have essentially an equivalent effect on cablecasters." By contrast, an over-the-air broadcaster with a television tower perched across the Oregon border, or a television network creating programming in New York, incurred few costs of performance in Oregon.

broadcast both via cable and over the air. However, legislators repeatedly discussed their desire to apportion over-the-air broadcast revenues based on relative "audience" size, and there is no evidence that they would have wanted those revenues to be apportioned instead by the "subscriber" proxy. Taxpayer's methodology uses Nielsen data to determine the audience for its over-the-air broadcasting activity and adds that to subscriber data from broadcasting by cable and satellite. The court finds that methodology consistent with the text, context and legislative history of the broadcaster apportionment statutes.

The department characterizes taxpayer's approach as "distortive," asserting that it "sweeps the subscribers of other entities [(DirecTV and Dish Network)] into Comcast's apportionment formula for a very small portion of Comcast's revenues: Comcast's programming activities contribute less than 5 percent of its overall revenues for 2007-2009." Taking this argument initially at face value, the court finds that it, too, relies on the department's faulty premise that a company providing cable service as one of its broadcasting activities is prohibited from apportioning receipts from other broadcasting activities based on the audience for those other broadcasting activities. At a deeper level, the department fails to supply any proof, other than to cite the percentage of taxpayer's revenues derived from providing cable service. As the department is aware, the term "distortion" has an established meaning in the context of income tax apportionment. *E.g.*, *Stonebridge Life Ins. Co. v. Dept. of Rev.*, 18 OTR 423, 431 (2006) (describing the "heavy burden" on a party to prove a "grossly distorted result" when seeking to escape a state's apportionment method on the grounds of unfairness). A claim that an apportionment method is distortive typically is accompanied by a wealth of data showing extraordinarily high disproportionality between (1) the percentage of a company's revenue attributed to the state by the apportionment formula; and (2) the percentage of the company's receipts actually generated in the state. *See id.* at 432-35 (recounting United States Supreme Court opinions finding impermissible distortion when reaching levels of 250 percent to 470 percent). The department offers nothing of the sort here. By contrast, taxpayer's method uses Nielsen-supported audience data for over-the-air network activity,

and for other network activity it uses the "subscriber" data on which licensees and advertisers actually base the amounts they pay to taxpayer. Because the court has concluded that taxpayer's method satisfies the statutory requirements, the department would have the burden of proving at trial that a different method is required. *Twentieth Century-Fox Film Corp. v. Dept. of Rev.*, 299 Or 220, 233, 700 P2d 1035 (1985). The court concludes that the department has failed to produce evidence that would satisfy its burden. *See* TCR 47 C.

Next, the department's brief includes a paragraph asserting:

> "In addition, Comcast does not account for its internet and voice subscribers, even though these services are delivered through the same fiber and coaxial cable as Comcast's television cable service. These services were part of the reason this court concluded that Comcast was an interstate broadcaster. The services involve the sending of one-way electronic signals. Comcast does not explain their absence of those subscribers from the apportionment formula they proposed."

Taxpayer rejects this argument, referring to a Ninth Circuit opinion and a Federal Communications Commission ruling concluding, respectively, that providing internet access and voice service involves two-way transmission, not transmission of a "one-way electronic signal" as required by the definition of "broadcasting" in ORS 314.680(1). At oral argument, the department claimed that the definition should be read to mean "one way *at a time*," referring generally to the Supreme Court's discussion of taxpayer's activities in the property tax context. *See Comcast Corp. v. Dept. of Rev.*, 356 Or 282, 337 P3d 768 (2014).[21] To the extent that the

---

[21] The department also asserted at oral argument that this court had rejected taxpayer's argument. This court's opinion in the 2007-09 Case, however, does not do that. Rather, this court stated:

> "At the hearing on this matter, and in briefing, there has been a discussion of the difference between 'transmission of one-way electronic signals' as opposed to 'one-way transmission of electronic signals.' There has also been a discussion of whether, as a matter of physics, all electronic signals are 'one-way.' The admissions of taxpayer establish that it engages in at least some activity covered by the definition of 'broadcasting' found in ORS 314.680(1) such that it is an 'interstate broadcaster' under ORS 314.680(3). Therefore, there is no need for the court to address, in this case, the question of the actual physics of transmission of electronic signals in general or as accomplished by taxpayer."

department seriously seeks to raise a legal issue, the court sees no need to address it, because the department makes no effort to offer facts about how either type of service actually works. The court declines to rely on this court's or the Supreme Court's descriptions of taxpayer's business for a single property tax year (2009-10) in this income tax appeal spanning six calendar years.

Finally, the court examines whether the department's administrative rule requires a different result. The rule, like the statutes, does not address the possibility of a single entity operating both an over-the-air network and a cable service. *See* OAR 150-314-0465. Subsection (2) recapitulates the legislature's intention, based on the legislative history, to use Nielsen or comparable viewership data to determine the audience for "television, radio, or network programming." Although subsection (4) of the rule requires a "cable television system" to use the number of subscribers as its "audience factor," the rule does not define a "cable television system." In the absence of a definition, the court defers to the intention expressed in legislative proceedings to assign over-the-air broadcasts based on Nielsen data and subscription broadcasts based on subscription data, which is the method taxpayer proffers.

The department attacks the position taxpayer takes on summary judgment as insufficiently related to any claim raised in taxpayer's complaint for the 2007-09 Case.[22] Taxpayer asserts that its position is grounded in its seventh claim, which reads:

"Interstate broadcasters that broadcast to subscribers or to an audience that is located both within and without Oregon, and that are taxable in another state under the provisions of ORS 314.620, are required to use an audience factor to determine the amount of gross receipts from broadcasting attributable to this State. OAR 150-314.684(4)(1) (1).

"Defendant erroneously determined that Plaintiff was an 'interstate broadcaster' within the meaning of OAR 150-314.684(4) and used an estimate to calculate Plaintiff's

---

*Comcast Corp. v. Dept. of Rev. (TC 5265)*, 22 OTR 295, 299 n 5.

[22] The department does not make this procedural claim with respect to the 2010-12 Case.

audience factor. *In the event Plaintiff is determined to be an interstate broadcaster, Plaintiff is entitled to an audience factor determined by the ratio that the population of the area served by the cable system service located within this State bears to the population of the area served by the cable system in all states in which the cable system has subscribers pursuant to OAR 150-314.684(4)(1) (1).*"

(2007-09 Case (emphasis added).) The department asserts that the italicized language requests apportionment by population, while taxpayer's motion requests apportionment by audience. Taxpayer argues that its motion is consistent with its claim as pled because the claim seeks apportionment based on the department's rule, which is based on audience and subscribers. The court finds that taxpayer's motion is adequately based in the claim because the claim seeks an Audience/Subscriber Ratio "pursuant to OAR 150-314.684(4)(1)." Moreover, the department has acknowledged that it has not been prejudiced by the specific method for determining the Audience/Subscriber Ratio requested in taxpayer's motion.[23] In fact, the department's own requested method differs substantially from either the strictly population-based method referred to in taxpayer's claim or the combination of Nielsen and subscriber data requested in taxpayer's motion; therefore, regardless of which method taxpayer advocated, the department would be in the same position of requesting a ratio based solely on the relative number of subscribers to taxpayer's cable system.

### 4. *Conclusion (Issue A)*

The text, context, and legislative history of the interstate broadcaster apportionment statutes support taxpayer's position and do not support the department's position. The court will grant taxpayer's motion on this issue.

### B. *Taxpayer's Motion: Apportionability of Dividends and Gain from Vodafone, Time Warner, and A&E*

Taxpayer's second cross-motion for partial summary judgment asks the court to retain taxpayer's classification

---

[23] The court notes that taxpayer alleges, and the department does not refute, that under the method in taxpayer's motion and a population method, "the numbers are almost the same anyway ***." (Citing emails from taxpayer's counsel to the department so stating.)

of three large income items as nonapportionable: gain from the sale of ownership interests in three companies and dividends from two of those same companies.[24] Taxpayer has chosen to not dispute the department's reclassification of all other income items as apportionable. Accordingly, the court begins with taxpayer's motion, which is limited to the treatment of income from ownership interests in Vodafone Group PLC (Vodafone), Time Warner Inc. (Time Warner) and A&E Television Networks LLC (A&E). The table below shows the sources and amounts of the income items remaining at issue and the years in which taxpayer realized them.

| | Vodafone | | Time Warner | | A&E |
|---|---|---|---|---|---|
| Year | Gain on Sale of Common Stock | Dividends on Preferred Stock | Gain on Sale of Stock | Dividends on Stock | Gain on Redemption (Sale) of Membership Interest |
| 2007 | $60,917,130 | $85,773,588 | $938,677,072 | $3,929,569 | — |
| 2008 | — | $84,859,500 | — | — | — |
| 2009 | — | $84,859,500 | — | — | — |
| 2010 | — | $84,859,500 | — | — | — |
| 2011 | — | $84,859,500 | — | — | — |
| 2012 | — | $84,859,500 | — | — | $777,196,727 |

1.  *Facts (Issue B)*

Unless otherwise indicated, the following facts are recited in taxpayer's brief, with citations to underlying declarations and documents, and are uncontested.

*Vodafone.* During the time periods relevant here, Vodafone was a public limited company headquartered in the United Kingdom in the business of providing wireless mobile telecommunications services. As a public company, Vodafone's shares traded on various overseas stock exchanges, including the London Stock Exchange and the

---

[24] Taxpayer's briefing primarily discusses the sales of the ownership interests, referring at times to three "transactions." However, taxpayer clarified at oral argument that the issues it contests include the treatment of dividends taxpayer received while holding the shares of Vodafone and Time Warner, not solely the gain taxpayer accrued when it sold its interests in the three companies.

Frankfurt Stock Exchange. Domestic instruments known as American Depositary Shares (ADSs) represented the stock and were publicly traded in the United States. (For convenience, the court refers to the underlying Vodafone "stock" rather than to the ADSs.) Taxpayer acquired its interest in Vodafone in 2002 when taxpayer acquired AT&T Broadband, a subsidiary of AT&T Corporation (AT&T). AT&T had, in turn, acquired its interest in Vodafone from a company known as MediaOne Group, Inc. (MediaOne), which AT&T acquired in June 2000. At the time of its acquisition by AT&T, MediaOne owned common and preferred stock in Vodafone, the former constituting a 4.9 percent ownership interest.

AT&T's acquisition of MediaOne was subject to review by the Federal Communications Commission (FCC). In its order approving the transaction, the FCC identified the Vodafone stock interest held by MediaOne and acquired by AT&T as a "passive equity interest," and as a "minority, noncontrolling interest that is not attributable for purposes of our cellular cross-ownership rules." During the years 2001 and 2002, AT&T disposed of approximately two-thirds of its Vodafone common stock holdings.

Taxpayer acquired AT&T's remaining shares in Vodafone when it acquired AT&T Broadband on November 18, 2002. At that time, Vodafone was the world's largest wireless mobile telecommunications company. It operated in 28 countries worldwide. Combined, the common and preferred Vodafone stock acquired by taxpayer represented less than three percent of Vodafone's total voting shares.

During the time taxpayer held its interest in Vodafone, (1) Vodafone's headquarters were located in Newbury, in the United Kingdom, and taxpayer's headquarters were located in Philadelphia, Pennsylvania; (2) no taxpayer employees were involved in the day-to-day operations or management of Vodafone, and no Vodafone employees were involved in the day-to-day operations or management of taxpayer; (3) taxpayer had no right to appoint any members of Vodafone's board of directors, and no members of Vodafone's board of directors were employees or directors of taxpayer; (4) the companies did not share common facilities

or services, including corporate office space, tax, finance, office technology, human resources, or employee benefit plans, nor did the companies share or transfer technology, intellectual property, or any other resource; and (5) taxpayer never pledged its interest in Vodafone as security for repayment of debt or used its interest in Vodafone as a financing vehicle to secure funds for taxpayer's general business operations.

Shortly after its acquisition of AT&T Broadband, taxpayer began to dispose of its Vodafone stock. Taxpayer sold the last of its Vodafone stock (approximately 2 million shares) in 2007 at a gain of $60,917,130. Taxpayer continued to retain ownership of Vodafone's dividend-paying preferred shares (which contained no management, operational or board appointment rights in the absence of any default on required dividend payments) and received dividends in the approximate amount of $85 million on the preferred shares during each of the tax years 2007 through 2012. Taxpayer treated the gain and dividend income as nonapportionable, nonbusiness income not allocable to Oregon, and the department determined that the gain and dividend income was business income subject to apportionment.

*Time Warner.* During all of the years at issue, Time Warner was a media and entertainment company headquartered in New York City. Time Warner's shares were traded on various stock exchanges, including the New York Stock Exchange. As of February 17, 2006, it had more than 4.4 billion shares of common stock outstanding. As discussed below, the gain at issue in this case is from taxpayer's sale in 2007 of shares of Time Warner common stock that taxpayer acquired in a conversion transaction on March 31, 2005.

Further facts regarding the earlier AT&T Broadband and MediaOne transactions are helpful: At the time that AT&T acquired MediaOne in June 2000, MediaOne held a 25.51 percent minority ownership interest in Time Warner Entertainment Company, LP (TWE). TWE owned and operated various Time Warner entertainment business assets and operations, including filmed entertainment, television production, television broadcasting, theme parks, and cable

television systems. The remaining 74.49 percent interest in TWE was held by Time Warner.

AT&T's acquisition of MediaOne was subject to review by the FCC. In approving the transaction, the FCC imposed several conditions on AT&T's ownership of TWE to comply with the FCC's cable ownership rules then in effect, which prohibited any cable operator from having attributed ownership interests in cable systems serving more than 30 percent of cable subscribers nationwide. Specifically, the FCC required AT&T to (a) divest its interests in TWE; (b) terminate its involvement in TWE's video programming activities; or (c) divest interests it held in other cable systems, such that it would have attributable ownership interests in cable systems serving no more than 30 percent of cable subscribers nationwide. In addition, the FCC imposed interim conditions restricting AT&T's ability to exert influence over TWE. Among other things, the FCC prohibited AT&T and TWE from sharing officers and directors.

Upon acquiring AT&T Broadband from AT&T on November 18, 2002, taxpayer acquired the interest that AT&T or AT&T Broadband held in TWE.[25] Like AT&T's acquisition of MediaOne, taxpayer's acquisition of AT&T Broadband was subject to review by the FCC. In its order approving the transaction, dated November 13, 2002, the FCC imposed conditions on taxpayer's ownership of TWE similar to those it had imposed on AT&T. Specifically, no officer or director of taxpayer was allowed to be an officer or director of TWE, and no officer, director, or other employee of taxpayer was allowed to influence or attempt to influence TWE's video programming activities. In addition, the FCC required taxpayer to place the TWE interest, and any successor interests, in trust overseen by an independent trustee, and to fully divest itself of any such interests within five and one-half years of taxpayer's acquisition of AT&T Broadband. Under the trust, the trustee had exclusive authority to exercise any management or governance rights associated with taxpayer's interest, including all voting, director appointment, consent, and management

---

[25] The record is not entirely clear whether the minority interest in TWE was held by parent company AT&T or subsidiary AT&T Broadband. The court does not find this point material.

rights. The trust agreement stated that "trustee *** will have the exclusive power and authority to manage the trust assets and to exercise [taxpayer's] rights relating to the TWE Interest, including all voting, director appointment, consent, and management rights."

To facilitate taxpayer's required divestiture of TWE, taxpayer and Time Warner entered into a restructuring of taxpayer's TWE interest on March 31, 2003. Under the restructuring, taxpayer exchanged its interest in TWE for convertible preferred stock in Time Warner,[26] certain additional cash consideration, and a 17.9 percent interest in a new subsidiary of Time Warner, called Time Warner Cable, Inc. (TWC), which operated the cable systems formerly owned by TWE. The interests taxpayer acquired in the March 2003 restructuring, including the Time Warner stock, were required to be held in trust, subject to the same FCC requirements described above, including the requirement to dispose of the interests within five and one-half years.

On March 31, 2005, the Time Warner convertible preferred stock was converted into 83,835,883 shares of Time Warner common stock, which represented approximately 1.9 percent of Time Warner's outstanding common stock. Taxpayer began selling its shares of Time Warner stock in 2005.

On July 31, 2006, taxpayer disposed of its 17.9 percent interest in TWC and its residual 4.7 percent interest in TWE. It did so pursuant to an April 2005 agreement with Time Warner in which Time Warner redeemed those interests. Taxpayer's 2007 Form 10-K describes the redemptions together with a transaction involving Adelphia Communications (Adelphia). The description indicates that taxpayer (i) paid cash to Adelphia for interests in two cable system partnerships and other assets; (ii) had its interests in TWE and TWC redeemed in exchange for interests in subsidiaries of each of those companies, respectively; and (iii) transferred the partnership interests to Time Warner Cable, Inc.

---

[26] Taxpayer retained a "residual" equity interest of 4.7 percent in TWE.

By the end of 2007, consistent with the FCC's order requiring it to dispose of the Time Warner stock, taxpayer disposed of all of its stock in Time Warner, either by sale or charitable contribution.

During the time taxpayer held its interest in Time Warner, (1) taxpayer maintained its headquarters in Philadelphia, while Time Warner maintained separate headquarters in New York City; (2) no taxpayer employees were involved in the day-to-day operations or management of Time Warner, and no Time Warner employees were involved in the day-to-day operations or management of taxpayer; (3) taxpayer had no right to appoint any members of Time Warner's board of directors, and no members of Time Warner's board of directors were employees or directors of taxpayer; (4) taxpayer shared no common facilities or services with Time Warner: the companies did not share corporate office space, tax, finance, office technology, human resources, or employee benefit plans, nor did the companies share or transfer technology, intellectual property, or any other resource; and (5) taxpayer never pledged its Time Warner stock as security for repayment of debt or used its Time Warner stock as a financing vehicle to secure funds for taxpayer's general business operations. Setting aside the department's discussion below of the July 31, 2006, redemption and exchange transaction, neither party points to any instance in which taxpayer employed its Time Warner stock in furtherance of taxpayer's operations.

In 2007, taxpayer received dividends on its Time Warner stock in the amount of $3,929,569. In the same year, Taxpayer realized gain of $938,677,072 from the sale of the last of its stock in Time Warner. On its tax return for the 2007 tax year, taxpayer treated the gain and dividend amounts related to its ownership of Time Warner stock as nonapportionable, nonbusiness income not allocable to Oregon. The department determined that the gain and dividend amounts were business income subject to apportionment.

*A&E.* Taxpayer's acquisition of its controlling interest in NBCU closed in January 2011. NBCU was formed as a new company, owned 51 percent by taxpayer and 49

percent by GE. GE contributed to the new company the businesses of NBCUniversal, Inc., which operated the historic NBCUniversal business, including its television networks, movie studios, and theme parks. Taxpayer contributed to the new company entertainment and other assets, including taxpayer's own television networks, and also paid cash consideration to GE. Among GE's contributions was an indirect wholly owned subsidiary of NBCU, NBC-A&E Holding, Inc. (NBC-A&E). NBC-A&E held a 15.8 percent ownership interest in A&E.

A&E was in the business of operating certain cable networks, including the A&E Network, Lifetime, and the History Channel. The remaining 84.2 percent of A&E was owned by Disney/ABC International Television, Inc. and affiliates (ABC) and Hearst Communications and affiliates (Hearst), each of which owned 42.1 percent. The interest in A&E held by NBCUniversal, Inc. or its subsidiaries dated back to the mid-1980s and at no time exceeded 25 percent.

The rights and obligations of NBC-A&E, ABC, and Hearst with respect to A&E were memorialized in a limited liability company agreement (the "A&E LLC Agreement"). The A&E LLC Agreement limited the participation and control of its individual members, providing that the company be run by a nine-person board of directors, and expressly stating that the LLC members lacked the power to bind the company individually. NBC-A&E, ABC and Hearst were each permitted to appoint three directors. At all meetings, the presence of at least three directors, including one appointed by each member, constituted a quorum for the transaction of business. The directors were required to cast a single vote for the member they represented. The A&E LLC Agreement provided that the board had complete authority, power and discretion to manage and control the business, affairs, and properties of the company. Specifically, the board had the authority to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the company's business, including approval of (i) the hiring and firing of key executives; (ii) compensation of key executives; (iii) the Annual Operating Plan;

(iv) programming acquisitions; (v) marketing and branding strategies; (vi) strategic initiatives; and (vii) corporate finance matters. A simple majority vote was required for the general management and control of the business.[27] The voting provisions of the A&E LLC Agreement, however, provided that ABC and Hearst agreed to cast their votes in the same manner, and NBC-A&E prospectively consented to their doing so. Consequently, ABC and Hearst had control of the day-to-day operations of A&E and its strategic direction.

During the time that taxpayer, through NBC-A&E, held its interest in A&E, (1) A&E had its own management and employees, and no taxpayer or NBCU employees were involved in the day-to-day operations or management of A&E; (2) there was no shared use of A&E's facilities, no centralized or joint purchasing, no joint marketing programs, no joint ownership of trademarks or similar intangible rights, no transfers of employees or technology between companies, and no intercompany financing or loan guarantees; and (3) in its Form 10-K filings with the Securities and Exchange Commission, taxpayer did not identify A&E as one of its cable networks.

The A&E LLC Agreement included mechanisms whereby NBC-A&E could either elect to sell (via put option), or be required to sell (via call option), its interest to the other members over the course of a 15-year option period. On July 9, 2012, NBC-A&E entered into a redemption agreement whereby A&E agreed to redeem NBC-A&E's entire 15.8 percent equity interest in A&E Television Networks, LLC. The redemption resulted in gain of $777,196,727, which taxpayer treated as nonapportionable, nonbusiness income not allocable to Oregon, and which the department determined was instead apportionable business income.

---

[27] As an exception, certain actions required unanimous consent pursuant to "anti-squeeze-out" provisions that generally gave NBCU the right to receive written notice, increased board representation and veto rights with respect to certain transactions. Those transactions included the issuance of new debt, transfers and distributions of noncash assets, and major dispositions with respects to both assets and cash. The anti-squeeze-out provisions indicated that as a minority stakeholder, NBC-A&E was vested only with those powers required to protect its existing investment in A&E; they did not grant NBC-A&E the ability to control the day-to-day operations of A&E or its strategic direction.

## 2. *Issue (B)*

Which, if any, of the items of income from Vodafone, Time Warner and A&E is apportionable?

## 3. *Analysis (Issue B)*

Taxpayer argues that the above facts show that none of the dividend income or gain is apportionable because (1) none of the three companies was engaged in a unitary business with taxpayer; and (2) none of taxpayer's direct or indirect stock holdings in Vodafone, Time Warner or A&E served an operational function in taxpayer's business. Taxpayer bases its arguments on the Due Process and Commerce Clauses of the United States Constitution, as interpreted by the United States Supreme Court and Oregon courts. The department accepts taxpayer's first point, that none of the companies were engaged in a unitary business with taxpayer. However, the department disputes the second point, arguing that taxpayer's holdings did serve an operational function under *Allied-Signal* because taxpayer's "mergers and acquisitions activity *** was a part of [taxpayer's] regular course of business." On the same grounds, the department also makes two affirmative arguments. The department's first affirmative argument is that the dividends and gain at issue are apportionable "business income" under the UDITPA definition in ORS 314.610(1). The second is that, in any event, the dividends and gain are apportionable because "the interstate broadcaster definition is broader than business income."[28] The court begins with the department's affirmative arguments, because those appear on their face to be based on statute. *See Pennzoil Co. v. Dept. of Rev.*, 332 Or 542, 546, 33 P3d 314 (2001) (pertinent statutes are considered before state and federal constitutions) (citing *Stelts v. State of Oregon*, 299 Or 252, 257, 701 P2d 1047 (1985)).

### a. Department's "business income" argument

The court first notes its prior conclusion in several cases that the Oregon legislature intended, both in its adoption of UDITPA and in its prior apportionment statutes, that Oregon's income taxes on multistate businesses

---

[28] This appears to be a reference to the definition of "gross receipts from broadcasting" in ORS 314.680(2).

reach to the limits allowed by the Oregon and United States Constitutions. *See Crystal Communications, Inc. v. Dept. of Rev.*, 20 OTR 111, 118 (2010) (recounting history of UDITPA and its predecessors), *aff'd*, 353 Or 300, 297 P3d 1256 (2013); *Fisher Broadcasting Co. v. Dept. of Rev.*, 22 OTR 69, 74 (2015) (explaining the "congruity of the statutory and constitutional tests" for apportionable business income). Indeed, on the very subject of a multistate business's gain from the sale of stock, the United States Supreme Court has held that constitutional limits may constrain what otherwise would be "business income" under UDITPA. While noting that the UDITPA definitions of "business income" and "nonbusiness income" "[i]n the abstract * * * may be quite compatible with the unitary business principle," the Court has stated that "[i]t does not follow * * * that apportionment of *all* income is permitted by the mere fact of corporate presence within the State * * *." *Allied-Signal*, 504 US at 786-87 (emphasis added).

The department does not appear to contest this general understanding of the relationship between UDITPA and the constitutional limitations on a state's taxing jurisdiction. Assuming the department were to prevail in its argument that taxpayer's dispositions of stock or partnership interests occurred in the "regular course" of taxpayer's business (a component of UDITPA's definition of "*business* income" (emphasis added)), taxpayer still would win the argument if it could show that the dispositions did not generate *apportionable* income under the constitutional test. Nor does the department rely on any other specific text in UDITPA that would be dispositive for either party if inconsistent with the constitutional test. For this reason, the court sees no need to undertake a statutory analysis. The court will examine the department's argument that the dividends and gain at issue are "business income" by applying the constitutional tests for apportionability as discussed below.

> b.   Department's argument based on "gross receipts from broadcasting"

The court turns to the department's second affirmative argument, that Oregon may tax an apportioned share of the dividends and gain because ORS 314.680(2)

defines "gross receipts from broadcasting" broadly. The court finds this argument misplaced. Even assuming the broadest possible meaning of the term, ORS 314.680(2) does not define *what types or items* of income may be apportioned; it defines only one of the components of the sales factor, which determines *how* to apportion income. The types or items of income that may be apportioned are set by the definition of "business income" under UDITPA, which, as concluded above, the court considers for purposes of this case to be coextensive with income that may be apportioned under *Allied-Signal* and other constitutional authority. ORS 314.682 makes this apparent: subsection (1) states that the special statutory provisions for interstate broadcasters "apply to the *apportionment of* the income of an interstate broadcaster." ORS 314.682(1) (emphasis added). Subsection (2) states that UDITPA (ORS 314.605 to 314.675) otherwise applies to interstate broadcasters. The UDITPA statutory series includes ORS 314.610(1), which defines "business income."

To illustrate, the court reprints the sales factor formula shown above, enhanced to add the role of "business income" (shaded) in relation to "gross receipts from broadcasting."



The court rejects the department's second affirmative argument because "gross receipts from broadcasting" does not *replace* "business income" in a broadcaster's sales

factor formula. Rather, "gross receipts from broadcasting" *modifies* "business income." And that modification can only *reduce* the amount of business income apportioned to Oregon because (as the Supreme Court concluded) both the numerator and the denominator of the sales factor include gross receipts from transactions and activities in the regular course of the broadcaster's trade or business.[29] *See Comcast*, 363 Or at 548 (rejecting taxpayer's argument that would have created a "top-heavy" sales factor). Therefore, contrary to the department's argument, the definition of "gross receipts from broadcasting" is arithmetically incapable of broadening the meaning of "business income."

#### c.   Taxpayer's constitutional argument

The court now turns to the sole remaining issue regarding the character of the dividends and gain: Taxpayer's constitutional argument that the dividends and gain are not apportionable because none of taxpayer's direct or indirect stock holdings in Vodafone, Time Warner, or A&E served an operational function in taxpayer's business.

The parties do not contest that *Allied-Signal* is the principal United States Supreme Court opinion governing whether the income at issue in this case is apportionable.[30] The taxpayer in that case, based in Michigan, manufactured four lines of products: automotive; aerospace/electronics; industrial/energy; and forest products. *Allied-Signal*, 504 US at 773-74. Its primary operations in New Jersey were the development and manufacture of aerospace products. *Id*. at 774. The taxpayer bought a total of 20.6 percent of the outstanding shares of ASARCO on the open market from December 1977 through November 1978 and sold them back to ASARCO in 1981 for a gain of $211.5 million. *Id*. New Jersey sought to tax an apportionable share of that gain. *Id*. The Court first applied its three-factor test of "business

---

[29] The court ignores the components "All other gross receipts attributable to Oregon" and "Any receipts excluded under Department rules," as no receipts in either category are at issue here.

[30] At one point in oral argument, the department invited the court to consider the dissenting opinion in *Allied-Signal*. The court declines to do so because the department did not brief this point or articulate any basis for this court to depart from the Court's majority holding.

unity" to the stipulated facts, concluding that the taxpayer and ASARCO were not engaged in a unitary business because there was no functional integration, economies of scale, or centralized management. *Id.* at 788. ASARCO was involved in the nonferrous metal production business and was not involved in any of the taxpayer's lines of business. *Id.* at 774. The parties stipulated that:

> "'There were no common management, officers, or employees of [the taxpayer] and Asarco. There was no use by [the taxpayer] of Asarco's corporate plant, offices or facilities and no use by Asarco of [the taxpayer]'s corporate plant, offices or facilities. There was no rent or lease of any property by [the taxpayer] from Asarco and no rent or lease of any property by Asarco from [the taxpayer]. [The taxpayer] and Asarco were each responsible for providing their own legal services, contracting services, tax services, finance services and insurance. [The taxpayer] and Asarco had separate personnel and hiring policies ... and separate pension and employee benefit plans. [The taxpayer] did not lend monies to Asarco and Asarco did not lend monies to [the taxpayer]. There were no joint borrowings by [the taxpayer] and Asarco. [The taxpayer] did not guaranty any of Asarco's debt and Asarco did not guaranty any of [the taxpayer]'s debt. Asarco had no representative on [the taxpayer]'s Board of Directors. [The taxpayer] did not pledge its Asarco stock. As far as can be determined there were no sales of product by Asarco itself to [the taxpayer] or by [the taxpayer] to Asarco. There were certain sales of product in the ordinary course of business by Asarco subsidiaries to [the taxpayer] but these sales were minute compared to Asarco's total sales.... These open market sales were at arms length prices and did not come about due to the [taxpayer's] investment in Asarco. There were no transfers of employees between [the taxpayer] and Asarco.'"

*Id*. at 775 (citing reference omitted; ellipses in *Allied-Signal*). The extensive stipulation included a statement that the taxpayer and ASARCO "'were unrelated business enterprises each of whose activities had nothing to do with the other.'" *Id.* at 774 (citing reference omitted).

After concluding that the taxpayer and ASARCO were not engaged in a common unitary business, the Court considered whether, as intangible assets, the taxpayer's holdings in ASARCO served, "on the one hand, an investment

function, or, on the other, an operational function." *Id.* at 785. Income from assets satisfying the "operational function" test is apportionable; income from assets serving only an "investment function" is not apportionable. *See id.* at 785-87. The operational function test "focuses on the objective characteristics of the asset's use and its relation to the taxpayer and its activities within the taxing State." *Id.* at 785. As an example, the Court stated that a "State may include within the apportionable income of a nondomiciliary corporation the interest earned on short-term deposits in a bank located in another State if that income forms part of the working capital of the corporation's unitary business, notwithstanding the absence of a unitary relationship between the corporation and the bank." *Id.* at 787-88. The Court later concluded that the taxpayer's holdings in ASARCO were not comparable to these kinds of bank deposits because the taxpayer held the ASARCO shares for over two years. *Id.* at 789-90.[31] The Court also referred to the possibility that a holding in intangibles such as futures contracts might serve an operational function as a hedge against price fluctuations for raw materials. *Id.* (referring to *Corn Products Refining Co. v. Comm'r*, 350 US 46, 50-53, 76 S Ct 20, 100 L Ed 29 (1955)); *see also MeadWestvaco Corp. v. Ill. Dept. of Rev.*, 553 US 16, 29, 128 S Ct 1498, 170 L Ed 2d 404 (2008) (describing *Corn Products* hedging transaction); *Fisher Broadcasting Co.*, 22 OTR 69, 77 (summarizing *Allied-Signal*'s operational function test). The Court did not conclude that the taxpayer's holdings in ASARCO were analogous to *Corn Products* investments.

---

[31] Although the quoted language at page 787 of the opinion refers to the "income" as "form[ing] part of the working capital," the sentence ends with a cross-reference to a later passage in the opinion, in which the Court applies this principle to the facts. The latter passage states: "Nor can it be maintained that [the taxpayer's] *shares of ASARCO stock*, which it held for over two years, amounted to a short-term *investment of working capital* analogous to a bank account or certificate of deposit." *Id.* at 789-90 (emphases added). This court concludes that it is the underlying asset (in that case, the cash deposited with the bank, or the ASARCO stock) that must serve an operational function. In other words, the Court did not imply on page 785 that the taxpayer's use, for investment or operational purposes, of the *proceeds* (bank interest or gain from the sale of the stock) determines whether the "operational function" test is satisfied. The Court rejected such an implication when it reiterated its rejection of the "purpose" test in *ASARCO Inc. v. Idaho State Tax Comm'n*, 458 US 307, 102 S Ct 3103, 73 L Ed 2d 787 (1982). *See Allied-Signal*, 504 US at 789.

The Court also described limitations on the "operational function" doctrine, stating that the "mere fact that an intangible asset was acquired pursuant to a long-term corporate strategy of acquisitions and dispositions does not convert an otherwise passive investment into an integral operational one." *Allied-Signal*, 504 US at 788. Finally, the Court rejected the New Jersey Supreme Court's reliance on the taxpayer's intent to use the proceeds of the sale of ASARCO stock to acquire Martin Marietta, a corporation that, like the taxpayer, was in the aerospace business. Even assuming that the taxpayer had undertaken the acquisition and operated Martin Marietta as part of the taxpayer's unitary business, the Court stated: "[T]hat reveals little about whether *ASARCO* was run as part of [the taxpayer's] unitary business." *Id.* at 789 (emphasis added). The Court concluded that the gain on the taxpayer's sale of its stock in ASARCO was not apportionable. *Id.* at 790.

The Court's only post-*Allied-Signal* opinion to discuss the concept of "operational function" apportionable income does not break new ground in the substantive issue here, but it clearly delineates the concepts that may be referred to as "enterprise unity" and "asset unity."[32] *MeadWestvaco Corp.*, 553 US 16. Enterprise unity may be lacking because the "payor" of the income at issue is engaged in a different unitary business from that of the "payee"— the classic example being a bank and its business customer. *See id.* at 28 (citing *Allied-Signal*, 504 US at 787-88). Nevertheless, if "asset unity" is present because the asset generating the income serves an operational function within the unitary business of the payee, the income is apportionable, and the state where the business entity operates may tax its apportioned share of that income as determined by

---

[32] Commentators interpreting United States Supreme Court opinions use the term "enterprise unity" to refer to the relationship between legal entities (such as separate corporations); enterprise unity exists if the relationship is characterized by "functional integration, centralized management, and economies of scale." *MeadWestvaco*, 553 US at 30 (citing *Mobil Oil Corp. v. Comm'r of Taxes of Vt.*, 445 US 425, 438, 100 S Ct 1223, 63 L Ed 2d 510 (1980)). "Asset unity" is the label that commentators apply to the relationship between a business entity and an intangible asset that generates the income at issue. Hellerstein & Hellerstein, *State Taxation: Third Edition* ¶ 8.08[2][b][i] 6-7 (July 2020) (discussing *ASARCO Inc.*, 458 US 307). Both "enterprise unity" and "asset unity" are tests within the overarching "unitary business principle."

the apportionment formula. *See id.* In the foregoing example, the account is an intangible asset in the hands of the business customer. If the account serves an operational function in the customer's business, interest from the account may be apportionable even though the customer and the bank are not engaged in a unitary business. In *MeadWestvaco*, the Court vacated the decision of the Illinois appellate courts because those courts had erroneously used a version of an "operational function" test to determine whether the main *business* of the taxpayer (producing paper) was unitary with the *business* of its operating division Lexis/Nexis. *Id.* at 24 ("We perceive a more fundamental error in the state courts' reasoning. In our view, the state courts erred in considering whether Lexis served an 'operational purpose' in Mead's business after determining that Lexis and Mead were not unitary.").

The Oregon Supreme Court applied *Allied-Signal* in *Pennzoil Co. v. Dept. of Rev.*, 332 Or 542, 33 P3d 314 (2001). In that case, the taxpayer sought to treat a payment in settlement of a tort judgment as nonapportionable under both UDITPA and the constitutional test in *Allied-Signal*. *See Pennzoil*, 332 Or at 544. A jury had concluded that Texaco interfered with the taxpayer's contract with the Getty Trust to acquire a large portion of the shares of Getty Oil, and had awarded Pennzoil monetary damages; in a subsequent settlement, Pennzoil agreed to accept a reduced amount of cash in satisfaction of the judgment. *Id.* The taxpayer's contract with the Getty Trust called for those parties to negotiate a restructuring of Getty Oil or, if they could not do so, to divide Getty Oil's oil and gas reserves and other assets between them. *Id.* The taxpayer's damages claim was based on the cost of finding and developing oil reserves. *Id.* The court rejected the taxpayer's argument that the payment arose from Texaco's *interference* with the taxpayer's contract with the Getty Trust, but the court, applying federal income tax principles applicable to settlement payments, concluded that the contract *itself* was the source of the payment. *Id.* at 547-48. The court then examined the taxpayer's purpose of entering into the contract and agreed with the department that the taxpayer's purpose was "to gain access to Getty's oil reserves." *Id.* at 548. The court concluded that the

payment was "in lieu of Pennzoil's right to acquire an interest in Getty's oil reserves. The acquisition of oil reserves is related—indeed is vitally important—to the continued blending and distribution of motor oil in Oregon." *Id.* at 550. The court thus allowed the settlement payment to be apportioned under *Allied-Signal* and UDITPA. *Id.*

This court has previously applied *Allied-Signal* in unappealed decisions, most recently in *Fisher Broadcasting*, 22 OTR 69. The facts, discussed in more detail below, involve a complex series of transactions, but the key conclusion is straightforward. The taxpayer, a broadcaster, pledged stock representing a minority interest in an insurance company as security to obtain a loan for operational purposes, including building a new headquarters building, paying off other debt, and for "general corporate purposes." *Id.* at 73. This court held that, by doing so, the taxpayer assigned an operational function to an asset that otherwise might have been considered to serve a mere investment function. *See id.* at 84; *see also* Hellerstein & Hellerstein, *State Taxation: Third Edition* ¶ 8.08[2][f][iii] 20 (July 2020) (arguing that stock pledged to secure financing for essential operations should be considered used in the business).

In a 1994 case in this court, it was the taxpayer that argued to have a large item of income apportioned under both UDITPA and *Allied-Signal*. *US Bancorp v. Dept. of Rev.*, 13 OTR 84 (1994). The taxpayer, a bank that at the time was based in Oregon, bought common and preferred shares of stock in a troubled Washington-based bank in a "stakeout" transaction intended to allow the taxpayer to later acquire the Washington bank outright. *Id.* at 86. The preferred stock included "detachable warrants" that gave the taxpayer a right to buy additional shares of common stock. *Id.* The taxpayer also extended a $20 million line of credit to the Washington bank and agreed to loan it another $10 million if necessary. *Id.* During the four years the taxpayer held the stock, it paid dividends to the taxpayer. *Id.* The Washington bank then attempted to rebuff the taxpayer by redeeming the preferred stock, resulting in gain to the taxpayer. *Id.* at 87. The taxpayer, however, retained the detachable warrants, discouraging other potential merger partners, and the taxpayer ultimately merged with the Washington bank. *Id.*

The taxpayer (again, based in Oregon at the time) argued that the dividends and gain were business income, seeking to apportion some of the income away from Oregon. *Id*. The court concluded that the purchase of the stock was not a mere investment. First, by including the detachable warrants, the preferred stock was "structured to provide [the taxpayer] with ownership opportunities when they became possible." *Id*. at 92. Second, the court found it significant that the taxpayer also loaned substantial sums to the Washington bank. *Id*. The court concluded that "[t]he nature of the transaction was such that [the taxpayer] was not just investing its capital in a passive investment. Its stock purchase and loans were designed to result in additional banking subsidiaries." *Id*. The court upheld the taxpayer's reported position that the dividends and gain were apportionable. *Id*. at 96.

In approaching the facts in this case, the court thus keeps in mind the basic rule of *Allied-Signal*, that income from an intangible asset, to be apportionable under the United States Constitution, must serve an operational function in the business that the taxpayer carries on in the taxing state, as opposed to a mere investment function that may benefit the taxpayer generally. *See Allied-Signal*, 504 US at 787-89. The court notes *Allied-Signal*'s rejection of a test based solely on a taxpayer's "long-term corporate strategy of acquisitions and dispositions" or the taxpayer's intended use of the income from the asset. *See id*. at 788. The court also considers the following nonexclusive examples from the foregoing cases illustrating assets that may serve an operational function:

- A bank account representing short-term investments of the taxpayer's working capital (*Allied-Signal*);

- Futures contracts that serve as a hedge against price fluctuations for raw materials or other business inputs (*Allied-Signal*);

- Stock, or a contract to buy stock, if the purpose of buying the stock is to acquire the underlying assets of the target corporation (*Pennzoil*; *US Bancorp*), especially when accompanied by loans to the target (*US Bancorp*); and

- A previously passive, minority interest in an unrelated company engaged in a different line of business that the taxpayer has pledged as security for a loan, using the loan proceeds to pay expenses to operate its regular business (*Fisher Broadcasting*).

The court now turns to the facts in this case, focusing on each "asset's use and its relation to the taxpayer and its activities within the taxing State." *See Allied-Signal*, 504 US at 785. Applying the court's summary judgment standard set forth above, the court starts by reviewing the uncontested facts, then the department's objections.

The general picture painted by the uncontested facts shows that taxpayer held its interests in each of Vodafone, Time Warner and A&E as a passive investment. Each was a minority interest during the entire time taxpayer held it; at the relevant time, taxpayer held less than three percent of Vodafone's voting shares, 1.9 percent of Time Warner's common stock, and a 15.8 percent interest in A&E. Taxpayer had little to no control over any of the respective companies. The department does not attempt to refute taxpayer's assertion that taxpayer was not engaged in a unitary business with any of the three companies. Taxpayer acquired each interest from a third party (AT&T, GE) as part of a larger transaction, and in the case of the Vodafone common stock and the Time Warner shares, taxpayer was under an FCC order to sell off the interests. In the case of A&E, taxpayer sold its interest about 18 months after acquiring it. From these facts, the court finds no indication that taxpayer used its interests for an operational function. At a high level, the court sees substantial overlap with the facts in *Allied-Signal*, where the Court concluded that the taxpayer manufacturer held its 20.6 percent interest in ASARCO as an investment, such that the gain on sale of the stock four years after acquisition could not be apportioned. *See Allied-Signal*, 504 US at 778-90.

Reviewing the examples of operational-function assets, the court finds nothing about taxpayer's stock in Vodafone or Time Warner, or its interest in A&E, that resembles an investment of "working capital," short-term or otherwise. There is no evidence that taxpayer bought

any of the stock using cash it would otherwise keep on hand to pay wages or other day-to-day business expenses. *Cf. Sperry & Hutchinson Co. v. Dept. of Rev.*, 270 Or 329, 333-34, 527 P2d 729 (1974) (income from short-term securities apportionable, where purpose of holding them was to satisfy needs for liquid capital during periods of cash flow deficit). Taxpayer acquired the stock of each company as an incident to a merger or acquisition of a different company in a larger transaction. In each case, the company that was the target of taxpayer's acquisition had been holding the same minority interest in the stock for some time, and, although taxpayer's purchase price for the target undoubtedly took into account the minority stock interest, taxpayer succeeded to the stock interest by operation of law upon acquiring the target.

The court also finds no evidence that the stock that generated the dividends and gain served as a hedge against fluctuations in taxpayer's operating costs, as was the case in the futures contracts for raw materials in *Corn Products*. The dividends and gain undoubtedly benefited taxpayer's business, but even the dissent in *Allied-Signal* acknowledged that benefiting the taxpayer's business in general does not suffice for the operational function test. *See Allied-Signal*, 504 US at 794 (O'Connor, J., dissenting) ("As the Court points out, any investment a corporation makes is intended to benefit the corporation in general."). The *Allied-Signal* Court's reference to *Corn Products* implies that the taxpayer's intent when acquiring the asset plays some role. *See Corn Products*, 350 US at 50-51 (hedging purchases were "initiated for just this reason" of insuring against increases in price of raw corn; relying in part on corporate officer testimony that company was "'trying to protect a part of (its) manufacturing costs'"). The evidence here reveals no intent by taxpayer to have the holdings serve an operational function.

Nor does the court find evidence that taxpayer acquired its interests in Vodafone, Time Warner, or A&E for the purpose of acquiring the underlying assets of those companies, as the courts found in *Pennzoil* and *US Bancorp*. Vodafone was a wireless mobile telecommunications company based in the United Kingdom, and taxpayer began

selling the Vodafone common stock shortly after acquiring it. Taxpayer held the Time Warner stock subject to an FCC-mandated trust agreement, pursuant to which taxpayer was required to dispose of the stock. Taxpayer's interest in A&E was somewhat different in that A&E operated cable networks. However, the short mentions of A&E in taxpayer's Form 10-K for 2011, the year taxpayer acquired its interest in A&E, merely list A&E's channels, quantify the dividends taxpayer received from A&E, and describe the mechanisms by which taxpayer's interest in A&E could be disposed of. The next year's Form 10-K mentions A&E only in discussions of the redemption of taxpayer's interest. Comcast Corp., Annual Report 2, 46, 62, 65, 91-92 (Form 10-K) (filed Feb 21, 2013, for fiscal year ending Dec 31, 2012).

Finally, unlike the facts in *Fisher Broadcasting*, taxpayer asserts that it never pledged its interests in Vodafone, Time Warner, or A&E as security for a loan, and the department makes no attempt to refute that.

4.  *Tentative conclusion (Issue B)*

Having reviewed the facts in light of the relevant cases, the court tentatively concludes that the dividends and gain at issue are not apportionable because taxpayer's interests did not serve an operational function.

5.  *Department's arguments (Issue B)*

The court now turns to the department's arguments.

*Vodafone.* The department asserts that the Vodafone stock served an operational function because "the fact that Vodafone stock was used as a *collar* and *collateralization* indicates an operational asset." (Emphases added.) The department quotes as follows from taxpayer's Form 10-K for 2003:

"Exchangeable Notes

    "We have outstanding notes exchangeable into the common stock of Cablevision NY Group ("Cablevision") Class A common stock, Microsoft Corporation ("Microsoft") common stock, Vodafone ADRs and Comcast Class A Special common stock (together, the "Exchangeable Notes"). At maturity the Exchangeable Notes are mandatorily redeemable

at our option into (i) a number of shares of common stock or ADRs equal to the underlying shares multiplied by an exchange ratio (as defined), or (ii) its cash equivalent. The maturity value of the Exchangeable Notes varies based upon the fair market value of the security to which it is indexed. *The Exchangeable Notes are collateralized by our investments in Cablevision, Microsoft and Vodafone, respectively.*

"The Comcast exchangeable notes are collateralized by our Class A Special common stock held in treasury. We have and intend in the future to settle the Comcast exchangeable notes using cash.

"During 2003, we settled $1.851 billion of our obligations relating to certain of our Exchangeable Notes by delivering the underlying shares of common stock or cash to the counterparty upon maturity of the instruments, and the equity collar agreements related to the underlying shares expired or were settled.

"As of December 31, 2003, our debt includes an aggregate of $4.318 billion of Exchangeable Notes, including $2.427 billion and $1.891 billion within current portion of long-term debt and long-term debt, respectively. As of December 31, 2003, the securities held by us collateralizing the Exchangeable Notes were sufficient to satisfy the debt obligations associated with the outstanding Exchangeable Notes."

Comcast Corp., Annual Report 24 (Form 10-K) (fiscal year ending Dec 31, 2003) (emphasis added). The department offers little interpretation of this passage, contending simply: "Thus, the $60,917,130 gain on the sale of Vodafone stock in 2007 is business income."

Regarding the department's use of the term "collateralization," it is evident from the 2003 quotation that the Verizon shares had, at some point, been pledged as security for debt in the form of the "Exchangeable Notes." The department seems to argue that, for that reason, the shares necessarily are factually analogous to the Safeco stock in *Fisher Broadcasting*. In *Fisher Broadcasting*, this court held that the Safeco stock became an operational asset when the taxpayer pledged it as security for debt and used the debt proceeds to repay other debt, finance construction of

a new corporate headquarters, and "for general corporate purposes." *See* 22 OTR at 73, 83-84. The stock continued to serve an operational function when the taxpayer replaced the original debt with new financing; although the taxpayer did not affirmatively pledge the Safeco stock to secure repayment of the new financing, the taxpayer agreed to what the court termed a "negative pledge" that essentially prohibited the taxpayer from selling the stock for any purpose other than repaying the debt or using the sale proceeds to "operate and expand the unitary business \* \* \*." *Id.* at 83-84. The court found that the initial pledge and later restrictions "result[ed] in a flow of value from the stock to the business of the pledgor, at least where, as here, borrowed funds are used in the business of the pledgor." *Id.* at 78.

In response to the department's argument, taxpayer has presented evidence, which the department has not contested, showing that it was not taxpayer, but rather a prior owner of the Verizon stock, that pledged the stock as security for debt. Recall that the Vodafone stock changed hands at least twice: MediaOne owned it until 2000, and AT&T owned it from 2000 to 2002, when taxpayer acquired it along with the AT&T Broadband business. One of taxpayer's tax managers, who had previously been employed first by MediaOne and then by AT&T Broadband, submitted a declaration and copies of MediaOne and AT&T SEC reports showing that the collateralization referred to in the 2003 quotation above

"pre[-]dated Comcast's acquisition of the Vodafone interest. It arose out of monetization transactions entered into by MediaOne \* \* \* and AT&T \* \* \* before Comcast acquired the Vodafone interest. The attendant obligations of these transactions subsequently were acquired by Comcast, along with the underlying securities. [6.] The entities that realized monetary benefit from these Vodafone monetization transactions were MediaOne and AT&T, not Comcast, as the transactions occurred before Comcast acquired the underlying securities."

*See* MediaOne Group, Inc., Annual Report 31-32 (Form 10-K) (fiscal year ending Dec 31, 1999).

The court finds that these undisputed facts refute the department's argument based on collateralization of

the Verizon stock. *Fisher Broadcasting*, interpreting *Allied-Signal* and *Container Corp. of America v. Franchise Tax Bd.*, 463 US 159, 103 S Ct 2933, 77 L Ed 2d 545 (1983), determined that asset unity requires that there be a "flow of value" from the asset to the operation of the business. *Fisher Broadcasting*, 22 OTR at 78. This flow may occur when the owner of the asset—typically, stock—pledges the stock to secure a loan and uses the cash proceeds from the loan for operational purposes. Here, however, taxpayer received the stock as a transferee after the stock already had been saddled by the debt. Any flow of value from the debt proceeds had gone to one or more prior owners, and taxpayer took the stock subject to the debt, holding it as a company might hold land subject to a preexisting mortgage. The court concludes that the "collateralization" of the Verizon stock did not cause the stock to serve an operational function in taxpayer's business.

Regarding the second term in the department's argument—"collar"—taxpayer responds that the department misunderstands the transaction. Taxpayer explains, by reference to the same 2003 Form 10-K, that the "collar" arrangement in this case is a set of option arrangements by which taxpayer protected itself from fluctuations in the value of the Verizon stock itself.[33] The court sees nothing inherent in the use of a collar that could transform the function of an intangible asset from an investment function into an operational function.[34] A company might choose to use a collar mechanism to protect the value of any asset, regardless of which function the asset serves. The court agrees with taxpayer that the presence of the collar structure did not affect the function of the Verizon stock.

---

[33] As taxpayer explains, by reference to the same 2003 Form 10-K, Comcast's investment in Vodafone was "accounted for as [a] trading securit[y]." Comcast Corp., Annual Report 56-57 (Form 10-K) (fiscal year ending Dec 31, 2003). The stated purpose of the collars (*i.e.*, "option agreements") was to "limit [Comcast's] exposure to and benefits from price fluctuations in the * * * Vodafone ADRs." *Id.* at 57. Comcast recorded the Vodafone collars "in investments at fair value, with unrealized gains or losses being recorded to investment income (loss), net." *Id.* Any "unrealized gains or losses [were] substantially offset by the changes in the fair value of shares of * * * Vodafone ADRs." *Id.*

[34] The transaction in *Fisher Broadcasting* also apparently involved a "collar" of the Safeco stock. 22 OTR at 73. That fact, however, does not appear to have contributed to the court's analysis.

The department also argues that the Vodafone stock was a "phone business investment[] acquired as part of the AT&T Broadband acquisition, and Comcast was *** laying plans for wireless telephone service, which it began marketing in the last couple of years." The department offers no facts supporting its assertion about taxpayer's "plans" and does not contest taxpayer's evidence of the absence of shared management, employees, facilities, intellectual property, or services. The court rejects this argument.

The department's final argument is that the dividends taxpayer received on the Vodafone preferred stock are apportionable. The department does not articulate an exact rationale, but it seems to rely solely on the fact that "[t]he preferred stock provides [taxpayer] an assured $85 million to use in its business annually." Later, the department asserts without citation that "[taxpayer] does not engage in transactions or activities that do not, through some angle, enhance its business activities." This court concludes that *Allied-Signal* dispatches this argument. It amounts to the same argument that New Jersey raised unsuccessfully in *Allied-Signal* with respect to gain, that income from intangible property "acquired, managed or disposed of for purposes relating or contributing to the taxpayer's business" is *per se* apportionable. *See Allied-Signal*, 504 US at 788-89 (internal quotations omitted).[35] The mere fact that taxpayer earned dividends on the stock, and used those dividends in its regular business, tells the court nothing about whether the stock served an operational function. The court finds no evidence that it did.

The court concludes that taxpayer's dividends on its preferred shares of Vodafone stock, and the gain on its sale of its shares of Vodafone common stock, are not subject to apportionment.

*Time Warner.* Regarding the Time Warner stock, the department makes no attempt to rebut taxpayer's factual evidence. Rather, it seeks to cast doubt with general assertions that the court finds lead nowhere. The department

---

[35] Idaho had raised the same argument unsuccessfully in *ASARCO* with respect to both dividends and gain. *ASARCO*, 458 US at 326 (rejecting apportionment of dividends from corporations not engaged in unitary business with taxpayer).

first quotes a passage from taxpayer's 2007 Form 10-K describing the July 31, 2006, transactions involving taxpayer's acquisition of certain Adelphia assets (including partnership interests) and Time Warner's redemption of taxpayer's interests in TWE and TWC in exchange for the partnership interests.[36] These transactions were complex, to be sure. However, the department provides no support or analysis for its conclusion that taxpayer, through these transactions or otherwise, "used its stock holdings in Time Warner as an operational asset." Because the court does not lightly grant summary judgment on an issue of such factual complexity, the court has attempted to reconstruct directly from the evidence whether the department's vague assertion might justify any inference in the department's favor. This has proved a time-consuming and fruitless endeavor. As taxpayer points out, there is simply no evidence that taxpayer deployed its shares of stock in Time Warner (the asset that actually generated the gain and dividends) in any operational function. The facts recited above, including the FCC-mandated divestiture and trust arrangement and the testimony taxpayer supplied, point in the opposite direction. Nor does the court find any basis to conclude that taxpayer's partnership interest in TWE, or its stock in TWC, served an operational function in taxpayer's business, or that if *those* assets had served an operational function, the function of the Time Warner stock somehow would have become operationalized by extension. The court finds no genuine issue of material fact in the department's allegation about the July 31, 2006, transactions.

The department makes two remaining points regarding the Time Warner stock, appearing in two sentences of its reply dedicated to the treatment of dividends:

> "[D]ividends paid to Comcast by Airtouch/Vodafone, TimeWarner, and others, were from Comcast's stock holdings in related businesses that had been acquired by Comcast in the regular course of its business. Those stock holdings were used to position Comcast for growth of its business in the communications industry and serving more customers in its day-to-day operations."

---

[36] The department also mentions this transaction in its reply relating to its own motion.

As to the first quoted sentence, that taxpayer's income from intangibles became apportionable simply because taxpayer acquired a lot of intangibles as part of its growth strategy, the *Allied-Signal* Court squarely rejected the same argument:

> "[T]he mere fact that an intangible asset was acquired pursuant to a long-term corporate strategy of acquisitions and dispositions does not convert an otherwise passive investment into an integral operational one."

*Allied-Signal,* 504 US at 788. As to the department's second sentence, it is a mere allegation. Despite a factual record of several thousand pages, the department makes no attempt to explain how taxpayer may have "used" any of its holdings in Time Warner (or Vodafone or A&E) to "position" itself for growth. The operational function test in *Allied-Signal* requires an individualized factual showing about the taxpayer's deployment of the particular intangibles generating the income. It is not sufficient for purposes of the operational function test that the intangibles consist of stock or other ownership interests in a company in the same industry or a related industry. *See Allied-Signal*, 504 US at 773-75; 788-89 (taxpayer's holding in ASARCO did not generate apportionable income even though taxpayer was a manufacturer of mechanical and electronic products);[37] *cf. Pennzoil*, 332 Or at 544, 548 (citing evidence from terms of thwarted stock purchase agreement and company statements that "the reason for its agreement with Getty was to gain access to Getty's oil reserves"); *US Bancorp*, 13 OTR at 86-87, 91-92 (citing taxpayer's loan to struggling target bank and options to buy additional stock in concluding that taxpayer's acquisition of stock was "designed to result in additional banking subsidiaries"). The fact that two entities are engaged in the same or related industries clearly is relevant when testing for *enterprise* unity, but there is no evidence that taxpayer's business was unitary with that of Time Warner (or Vodafone or A&E), and the department does not argue that it was. The court thus rejects the department's remaining points.

---

[37] The court also notes that ASARCO subsidiaries sold metals products to the taxpayer in *Allied-Signal* at arm's-length prices, although "these sales were minute compared to ASARCO's total sales." *Allied-Signal*, 504 US at 775.

The court concludes that taxpayer's dividends on its shares of Time Warner stock, and the gain on its sale of its shares of Time Warner stock, are not subject to apportionment.

*A&E*. The department makes two arguments regarding taxpayer's income from its interest in A&E. First, in its response to taxpayer's partial summary judgment motion, the department again makes generalized recitations and assertions about taxpayer's "eager[]" acquisitiveness. As discussed above regarding the Time Warner stock, the court again rejects this argument based on *Allied-Signal*'s refusal to automatically treat gain or dividends as apportionable due to the taxpayer's "long-term corporate strategy of acquisitions and dispositions." *Allied-Signal*, 504 US at 788.

Second, the department quotes a passage from taxpayer's 2012 Form 10-K, emphasizing that taxpayer, through NBCUniversal, received "dividends" from A&E "which were included in net cash provided by operating activities."[38] (Quoting Comcast Corp., Annual Report 65 (Form 10-K) (filed Feb 21, 2013, for fiscal year ending Dec 31, 2012).) Nowhere does the department explain the significance of the accounting treatment of this item. Taxpayer responds that generally accepted accounting principles require all dividends to be classified as cash from "operating activities," without regard to whether a dividend must be apportioned or allocated for state tax purposes. The department has made no effort to refute this point.

But for the following discussion, the court is inclined to conclude that taxpayer's gain on the sale of its interests in A&E is not subject to apportionment.

---

[38] A&E itself was a limited liability company that was classified for tax purposes as a partnership; as such it would not have paid "dividends" under income tax law, and it is unlikely that it would have paid "dividends" in the corporate-law sense. (A&E LLC Agreement) (indicating A&E was classified as a partnership for tax purposes). The court assumes that corporate subsidiaries of A&E may have paid dividends to A&E that A&E's members included in their gross income based on their distributive shares in A&E. The briefing is not clear on this point, but for purposes of taxpayer's motion the court considers the point immaterial because that motion does not challenge the treatment of the A&E dividends. The court expresses no view on whether taxpayer's share of the A&E "dividends" was apportionable.

The parties have not briefed whether, or in what circumstances, a partnership interest when sold should be treated as an item of intangible property akin to the stock in *Allied-Signal*, or whether an aggregate theory of partnership applies, perhaps requiring the court to look through the partnership to its underlying assets. *See generally* Hellerstein, *State Taxation* ¶ 9.12[2] at 1 (characterizing question as unresolved under original UDITPA; no discussion of constitutional test). *See also* Jamie S. Fenwick *et al*, *State Taxation of Pass-Through Entities and Their Owners* ¶ 11.03[2] 2 (2016) (asserting without citation that *Allied-Signal* test "should" apply to gain from sale of an ownership interest in a pass-through entity). Application of Oregon's version of UDITPA, as amended in 1989, would perhaps result in some amount of Oregon tax liability regardless of whether the gain is apportionable "business income." *See* ORS 314.635(4) (requiring gain from sale of a partnership interest to be "allocated" to Oregon by formula based on original cost of partnership tangible personal property in Oregon vs. everywhere; alternatively, applying prior year's sales factor for the partnership if more than 50 percent of partnership assets consists of intangibles); *see* Or Laws 1989, ch 625, § 64. However, the court is not aware of any cases addressing whether Oregon's statutory method for assigning gain from disposition of a partnership interest complies with the constitutionally mandated treatment of income that is not subject to taxation on an apportioned basis. The court will deny both parties' motions on this issue, and the court will allow leave for either party to seek summary judgment on the constitutional or statutory treatment of the gain from the sale of the A&E interests as partnership interests.[39]

---

[39] Similarly, neither party has set forth adequate facts or adequately briefed the argument, raised in the department's motion but not in taxpayer's motion, that income that passed through A&E was required to be apportioned because A&E was a partnership. In its reply brief and at oral argument, the department stated its position that income passing through a partnership is "simply gross receipts from the regular course of its business," on the theory that a partner always is engaged in the business of the partnership. The court will deny the department's motion on this point and, as with the issue of gain from the sale of taxpayer's interests in A&E, will allow leave for either party to seek summary judgment on this issue. *See CRIV Investments, Inc. v. Dept. of Rev.*, 14 OTR 181 (1997).

6.   *Conclusion (Issue B)*

The court concludes that taxpayer's dividends and gain from the Vodafone and Time Warner stock were non-apportionable because that stock did not serve an operational function in taxpayer's business. The court will grant taxpayer's motion on apportionability as to the Vodafone and Time Warner stock. As to taxpayer's interests in A&E, the court will deny taxpayer's motion (as well as the department's motion to the extent it addresses the same issue), with leave to either party to file a new motion that takes into account the statutory and constitutional treatment of the A&E interests as partnership interests.

C.   *Department's Motion: Composition of Unitary Group (Comcast MO Financial Services, Inc.)*

The department seeks summary judgment on taxpayer's claim that taxpayer was not engaged in a single unitary business with Comcast MO Financial Services, Inc. and subsidiaries (collectively, the "MOFS Group"). Taxpayer argues that the department has failed to show that there is no genuine issue of material fact. In support of its position on this issue, the department relies extensively on the MTC Excerpt, which the court has declined to admit into evidence. By contrast, in resisting the department's motion, taxpayer has put into evidence declarations of persons with first-hand knowledge and supporting documents. The department's attempt on reply to refute taxpayer's position using taxpayer's evidence and public filings is inadequate to satisfy the department's burden as the moving party. The court readily concludes that the department has failed to show that there is no genuine issue as to any material fact. The court will deny the department's motion as to this argument.

D.   *Department's Motion: Apportionability of Other Income Items*

The department's motion seeks to recharacterize as business income all items that taxpayer classified as nonbusiness income for any of the Years at Issue. As explained above, taxpayer has chosen to not contest this

recharacterization except with respect to dividends and gain from taxpayer's stock in Time Warner and Vodafone, and pass-through income and gain from taxpayer's interest in A&E. The court has addressed all arguments that the court considers colorable in its discussion above of taxpayer's apportionability motion (Issue B). As to the treatment, as apportionable or not apportionable, of gain from the sale of taxpayer's interests in A&E, as well as income passing through A&E as a partnership, the court will deny the department's motion, with leave to either party to file a new motion that takes into account the statutory and constitutional treatment of the A&E interests as partnership interests. As to the treatment, as apportionable or not apportionable, of other income items not identified in this paragraph, the court will grant the department's motion.

E.   *Department's Motion: Sales Factor Relief*

Taxpayer makes an alternative claim for each of the Years at Issue. Taxpayer claims that, if the court upholds the department's reclassification as business income of any capital gains and losses, dividends or pass-through income and losses, those amounts "constitute 'sales' for Oregon sales factor apportionment purposes and must be included in the denominator of the sales factor pursuant to ORS 314.665(1)." The department's motion urges the court to deny this claim on the grounds that, under the Oregon Supreme Court's opinion, "the numerator (before the audience ratio is applied to it) must be the same as the denominator." While this statement appears to agree with taxpayer's claim, taxpayer takes particular issue with the department's next assertion: "The better approach is to exclude these intangible income items from the denominator, but if they are included then they must be included in the numerator as well—resulting in a 'wash.'" Because this claim is an alternative claim, the court's conclusion as to the Vodafone and Time Warner items has rendered the claim moot as to those items. With respect to all other receipts, the court finds the factual record inadequate. The court will deny the department's motion as to this claim, with leave to either party to seek summary judgment on a more complete factual record.

### F.  *Net Operating Loss Carryforward Deductions*

Taxpayer claimed deductions on its returns for tax years 2007 through at least 2010 resulting from its carrying forward of net operating losses (NOLs) that it incurred in tax years 2003 through 2006 ("taxpayer's NOL Years").[40] The department denied the carryforward deductions and seeks summary judgment on two grounds. Taxpayer resists the department's motion but has not cross-moved on this issue; taxpayer asserts that if the court denies the department's motion, thereby allowing taxpayer to contest the denial of its carryforward deductions, trial will be necessary to determine the facts establishing the amount of its income or loss in taxpayer's NOL Years and whether it is entitled to any carryforward deductions for the Years at Issue.

Both parties refer to the Oregon Supreme Court's recent decision in *Hillenga v. Dept. of Rev.*, 358 Or 178, 361 P3d 598 (2015). That opinion thoroughly explained the concept of an NOL and how the amount of an NOL incurred in one year may be "carried forward" to later tax years and deducted from gross income in those "carryforward years." *See id.* at 180-82.[41] The court held that the fact that the NOL year may be closed to audit does not preclude the department from seeking to recalculate the taxpayer's taxable income or loss for the NOL year for the limited purpose of determining the correct amount of a carryforward deduction the taxpayer claimed on a return for a carryforward year. *Id.* at 194. The court found persuasive the federal case law on the same issue and noted that "[t]he rule that the federal courts have announced is not one-sided; it does not favor only the taxing authority." *Id.* at 191 (citing *Springfield St. Ry. Co. v. United States*, 312 F2d 754 (Ct Cl 1963) (taxpayer allowed to recalculate taxes for a closed year for which it had failed to take an allowable deduction).

---

[40] It is unclear from the record whether taxpayer claimed carryforward deductions from taxpayer's NOL Years beyond 2010.

[41] The Oregon statutory authority differs as between the personal income taxpayers who were plaintiffs in *Hillenga* and a corporate taxpayer such as the plaintiff in this case. ORS 317.344 requires a corporate taxpayer to add back any federal NOL carryover or any NOL carryback when computing Oregon taxable income. ORS 317.476 allows a carryforward of NOLs for up to 15 years but does not allow a carryback of NOLs. The court does not consider the statutory differences material for resolution of the department's motion.

1.   *Issue (F)*

May taxpayer contest the department's adjustments to taxpayer's NOL carryforward deductions for the Years at Issue?

2.   *Analysis (Issue F)*

Taxpayer asserts that *Hillenga* controls this case and requires the court to deny the department's motion. The department seeks to distinguish *Hillenga* on two grounds, which the court labels, solely for ease of reference, an "equity" principle and a "substantive" issue. The department's written arguments are very short, comprising a total of three pages in two briefs. The court finds it necessary to restate the arguments in order to analyze them.

The department's "equity" argument is that taxpayer could have appealed its income or loss for taxpayer's NOL Years but failed to take the right steps to do so timely and has thereby lost its right to contest the department's adjustments to taxpayer's carryforward deductions for the Years at Issue. The department argues that, because the statute of limitations for appeal to the Tax Court, ORS 305.280,[42] now bars taxpayer from litigating its income or

---

[42] ORS 305.280 generally imposes a 90-day limitations period for an initial appeal to this court, other than an appeal from an order of a county board of property tax appeals, although subsection (3) allows certain appeals within two years after the tax has been paid. The statute provides in relevant part:

"(1) Except as otherwise provided in this section, an appeal under ORS 305.275 (1) or (2) shall be filed within 90 days after the act, omission, order or determination becomes actually known to the person, but in no event later than one year after the act or omission has occurred, or the order or determination has been made. An appeal under ORS 308.505 to 308.665 shall be filed within 90 days after the date the order is issued under ORS 308.584 (3). An appeal from a supervisory order or other order or determination of the Department of Revenue shall be filed within 90 days after the date a copy of the order or determination or notice of the order or determination has been served upon the appealing party by mail as provided in ORS 306.805.

"(2) An appeal under ORS 323.416 or 323.623 or from any notice of assessment or refund denial issued by the Department of Revenue with respect to a tax imposed under ORS chapter 118, 308, 308A, 310, 314, 316, 317, 318, 321 or this chapter, or collected pursuant to ORS 305.620, shall be filed within 90 days after the date of the notice. An appeal from a proposed adjustment under ORS 305.270 shall be filed within 90 days after the date the notice of adjustment is final.

"(3) Notwithstanding subsection (2) of this section, an appeal from a notice of assessment of taxes imposed under ORS chapter 314, 316, 317 or 318

loss from the NOL Years in an appeal as to those years, the court cannot allow taxpayer to invoke *Hillenga* or other case law as to the carryforward deductions. To do so, the department argues, would allow taxpayer to "dodge the statute of limitations by collaterally attacking earlier years' adjustments that were not appealed * * *." Taxpayer acknowledges that the department audited taxpayer's NOL Years but rejects the department's factual premise on the grounds that it has paid the tax asserted in the department's notices, has timely filed a refund claim for the NOL Years, and is awaiting the department's action on that claim. The department rejects taxpayer's contention that a timely refund claim is pending.

The court finds that at least two sets of facts relevant to the department's "equity" argument are contested. First, the department cites no evidence for its assertion that taxpayer failed to timely exercise its appeal rights as to taxpayer's NOL Years. In the normal progression of an income tax audit that results in an appeal to this court, the department issues two notices after completing the audit of the taxpayer's returns: (1) a notice of deficiency, from which the taxpayer may appeal within the department via a written objection and an optional request for a "conference," and (2) a notice of assessment after the taxpayer either has pursued its administrative appeal rights without success, or has not acted on its administrative appeal rights. *See* ORS 305.265. Here, taxpayer submitted the department's audit report and notices of deficiency for taxpayer's NOL Years as exhibits to a declaration by employee Thomas Donnelly.[43] Those documents show that the department did indeed conduct an audit of taxpayer's NOL Years, after which the auditor issued notices of deficiency explaining the auditor's conclusions and taxpayer's administrative "appeal" rights. Nothing in the record indicates that taxpayer pursued any appeal within the department. Nor did either party introduce

---

may be filed within two years after the date the amount of tax, as shown on the notice and including appropriate penalties and interest, is paid."

[43] Curiously, at oral argument, the department objected, on relevance grounds, to the admission of the deficiency notices and to a demonstrative exhibit that explained them. The court overrules the department's objection, as the documents are fundamental to the premise of the department's own position that it audited taxpayer for the NOL Years.

evidence relating to taxpayer's alleged payment of the tax and subsequent refund claim for taxpayer's NOL Years. Finally, although the department refers to ORS 305.280 as the statute that taxpayer seeks to "dodge," the department has introduced no evidence that the department has issued a "notice of assessment" (referred to in subsections (2) and (3)), nor has the department identified any other "act, omission, order or determination" that would have started the running of a 90-day limitations period under subsection (1). The court lacks any basis to decide whether taxpayer still has an opportunity to contest its taxable income or loss for the NOL Years in an appeal to this court stemming from the notices of deficiency or the alleged refund claim; therefore, the department's motion fails on this factual ground.

Second, the department's "equity" argument implicitly seeks to apply principles of claim preclusion or issue preclusion, but the department offers no evidence on the nature or scope of the allegedly unappealed prior proceedings.[44] Given that there is no evidence whether taxpayer pursued any administrative remedies, the issue is whether the audit itself has preclusive effect. No statute provides that failure to appeal from the result of an audit precludes adjudication of an issue that a taxpayer contested or could have contested in the audit, and the department asserts no constitutional basis for preclusion. *See Fisher*, 321 Or at 347 ("Issue preclusion can be based on the constitution, common law, or statute."). Accordingly, the question is whether the common-law doctrine of issue preclusion applies. One element of the common-law test is that "[t]he prior proceeding [be] the type of proceeding to which this court will give preclusive effect." *See Nelson v. Emerald People's Utility Dist.*, 318 Or 99, 104, 862 P2d 1293 (1993) (establishing five-part test for issue preclusion). Courts look to the degree of formality or

_____

[44] In *Fisher Broadcasting, Inc. v. Dept. of Rev.*, 321 Or 341, 345 n 4, 898 P2d 1333 (1995), the court explained the overall concept of preclusion by former adjudication and its two main branches of claim preclusion (*res judicata)* and issue preclusion (collateral estoppel). The court here refers to issue preclusion because the question is whether taxpayer can litigate a discrete issue (its taxable income or loss for taxpayer's NOL Years) in these consolidated cases for the purpose of determining any carryforward deduction for the Years at Issue. *See also Drews v. EBI Companies*, 310 Or 134, 139-45, 795 P2d 531 (1990) (explaining doctrine of preclusion by former adjudication and its branches).

comprehensive nature of the administrative procedure. *See Lethin v. Dept. of Rev.*, 278 Or 201, 206, 563 P2d 687 (1977) (county assessor's appraisal in one year does not preclude revaluation in different year); *see also State v. Ratliff*, 304 Or 254, 744 P2d 247 (1987) (license suspension proceedings before Department of Motor Vehicles not preclusive for criminal proceedings on driving under influence of intoxicants). This court seriously questions whether an income tax audit of the kind typically seen in this court could have preclusive effect on later judicial proceedings. But since the department has made no effort to introduce facts relevant to the common-law test, the court concludes that it cannot determine whether the audit prevents taxpayer from challenging the department's carryforward adjustments. The department's motion fails on this factual ground as well.[45]

The court also questions whether any other equitable or prudential doctrine would bar taxpayer from contesting the department's recalculations of its income or loss from the NOL Years. The department seems to argue that its adjustments to taxpayer's carryforward deductions are immune from challenge by taxpayer because the department was at a procedural disadvantage until taxpayer sought to carry forward the NOLs and use them on its returns for the Years at Issue. Specifically, the department asserts that any comparison between its position in *Hillenga* and that of taxpayer would be a "false equivalency" because the department's right to act on an overstated NOL is constrained, while a taxpayer has an unconstrained right to appeal whatever action the department does take. The constraint that the department refers to is explained in *Hillenga*:

> "The department has no general authority to take issue with every deduction claimed by a taxpayer on a particular tax year's return. Rather, that authority arises only if the

---

[45] To the extent that the department's argument could be read as an allegation that taxpayer has failed to exhaust administrative remedies before seeking to contest the department's carryforward adjustments in these consolidated cases, the argument fails for lack of the same basic facts of events after the department's notices of deficiency for taxpayer's NOL Years. *See generally Charter Communications Holding Co., LLC v. Dept. of Rev.*, 24 OTR 88 (2020) (applying *Tuckenberry v. Board of Parole*, 365 Or 640, 451 P3d 227 (2019)); concluding no exhaustion requirement for centrally assessed property tax appeal under ORS 308.584).

deduction affects the amount of tax owed by a taxpayer for a given tax year. Specifically, after a taxpayer files a tax return for a given year, the department is charged with examining the return as soon as practicable, computing the tax owed for the period covered by the return, and notifying the taxpayer if the department discovers a 'deficiency.' ORS 305.265(2). A deficiency, for that purpose, basically means taxes owed but unpaid. * * *

"For the department to issue a notice of deficiency, there must be some tax owed. Accordingly, there can be no deficiency if the taxpayer has no taxable income. That point becomes significant when one considers that the taxpayer's taxable income may be less than zero, as is true when the taxpayer has a net operating loss. If a taxpayer incorrectly claims deductions leading to a net operating loss of $400,000, but the department concludes that the taxpayer's actual net operating loss was only $40,000, the department has no ability to issue a deficiency. Whether the true loss is $40,000 or $400,000, it is still a loss, the taxpayer still owes no taxes, and the department cannot issue a deficiency."

*Hillenga*, 358 Or at 184-85 (internal footnote omitted). The department invites the court to compare this constraint on the department with a taxpayer's rights to appeal, apparently arguing that a taxpayer is not constrained from appealing whatever action the department takes as to an NOL year. Applying the Supreme Court's example above, the department appears to assert that a taxpayer can challenge the department's reduction of its NOL from $400,000 to $40,000 in an appeal for the tax year of the NOL. And if the taxpayer fails to do so within 90 days of the reduction, the department seems to argue, the taxpayer is forever barred from contesting the department's denial of carryforward deductions attributable to the $360,000 that the department disallowed for the NOL year.

The statute conferring the taxpayer's right to appeal to this court is ORS 305.275. That statute requires the taxpayer to be "aggrieved by and affected by" an act, order or determination of the department that affects the taxpayer's property, and there must be "no other statutory right of appeal for the grievance." ORS 305.275(1). The department seems to argue that adjustments that merely reduce the amount of an NOL but do not result in a deficiency cause

the taxpayer to be "aggrieved" by the adjustment, even though the taxpayer owes no additional tax for the NOL year.[46] This court sees no need to decide whether a taxpayer is "aggrieved" and has "recourse" to contest the amount of an NOL reduction for the NOL year, however, because the court concludes that, so long as the amount of the taxpayer's taxable income or loss for the NOL year has not actually been litigated in a proceeding with preclusive effect, there is no equitable reason to deny the parties the chance to do so for purposes of a carryforward deduction. The purpose of allowing recalculation under *Hillenga* is to determine the correct amount of tax due for the carryforward year. If the facts needed to make that determination have not yet been established in a prior proceeding, the court sees no reason why the court should be precluded from doing so.

The court now turns to the department's second argument based on "taxpayer identity." The department asserts that the NOL that taxpayer carried forward from tax years 2003 to 2006 "simply flows from the department's decision as to the composition of [taxpayer's] unitary group under Oregon chapter 317." The department characterizes this decision as a "determination as to the very identity of the 'taxpayer,' i.e., which companies should have been included in the unitary group consolidated returns" filed for the loss-generation years. According to the department, the nature of the substantive issue "goes beyond a question of NOL calculation" as in *Hillenga* and other loss recalculation cases.

The court sees no logic in the department's argument that a recalculation of underlying NOLs is sometimes permissible and sometimes not, depending on what substantive issues cause the department to believe that the taxpayer claimed an excessive NOL on its return. A taxpayer may report an NOL on its return for any combination of reasons that basically reduce to claiming more deductions than gross income for the tax year. *See* IRC § 172(c) (defining

---

[46] The Oregon Supreme Court's recent opinion in *Seneca Sustainable Energy, LLC v. Dept. of Rev.*, 363 Or 782, 796-98, 429 P3d 360 (2018), discusses the aggrievement requirement but had no need to address the specific fact pattern here.

"net operating loss" as "the excess of the deductions allowed by this chapter over the gross income").[47] Recalculating the NOL can mean redetermining the propriety of every item on the return as well as items that the taxpayer may have omitted from the return. The department refers to no Oregon or federal authority that establishes or supports the limitation it asks the court to apply, and the cases are remarkable for the wide range of underlying issues involved. In *Hillenga*, the taxpayers had claimed, but failed to adequately substantiate, business expense deductions for automobile, travel, and entertainment expenditures. *Hillenga v. Dept. of Rev.*, 22 OTR 301, 302 (2016) (on remand). In *Springfield Street Railway*, which the department also cites, the underlying issue was whether the taxpayer could claim deductions for abandoning portions of a railway network. *Springfield Street Ry.*, 312 F2d at 755. The underlying issue in *State Farming Co.*, discussed in *Hillenga*, was the taxability of a refund from California after that state's Alien Land Law was declared unconstitutional and repealed. *State Farming Co. v. Comm'r*, 40 TC 774, 778-81 (1963). In *Phoenix Electronics*, which the Supreme court referred to extensively in *Hillenga*, the District Court judge saw no reason to even specify the nature of the underlying issues, except to state that they did not involve fraud. *Phoenix Electronics, Inc. v. U. S.*, 164 F Supp 614, 615 (1958) (NOL "resulted from the taking of certain deductions which it now appears were unauthorized"); *see also Comm'r v. Van Bergh*, 209 F2d 23, 24 (2d Cir 1954) (declining to decide or identify underlying issue leading to claimed NOL). The issue the department describes in this case does indeed go to the "identity" of the taxpayer, but the question of whether corporations are engaged in the same unitary business is by no means uncommon, as *Allied-Signal* and other cases discussed above demonstrate. The department offers no theory or authority that would require the court to deviate from the general rule that the party seeking to recalculate a reported net loss for the year of origination may take into account any item that should have been treated differently in preparing the return.

---

[47] All references to the "IRC" or the "Code" are to the Internal Revenue Code of 1986, as in effect for 2007 to 2012.

### 3.  *Conclusion (Issue F)*

The court will deny the department's motion on this claim. The issue may proceed to trial to determine whether any change to the carryforward deductions taxpayer claimed for the Years at Issue is warranted.

## G.  *Deduction/Addback of Tax Paid to Other States*

ORS 317.314(1) requires a corporation to add to its computation of federal taxable income the amount of any "taxes upon or measured by net income or profits imposed by * * * any state or territory deducted in computing federal taxable income."[48] After concessions, the sole issue under this statute is whether taxpayer acted properly when it did not add its payments of Texas "margins" tax to its federal taxable income. The department contends that the Texas tax is, "in substance, an income tax on or measured by net income." Taxpayer disagrees.

### 1.  *Issue (G)*

Must taxpayer increase its taxable income by the amount of Texas margins tax it paid?

### 2.  *Analysis (Issue G)*

The Texas margins tax, as in effect during the years at issue here, is imposed on a taxpayer's "taxable margin." Ignoring a special formula applicable to certain smaller-revenue taxpayers, the computation of taxable margin

> "begins with 'total revenue,' a figure derived by adding together select amounts reportable as gross income on a federal tax return, subtracting bad debts and other items included on the federal return, and excluding receipts associated with various transactions. [Tex Tax Code] §§ 171.101(a), .1011. From total revenue, the taxpayer deducts the largest of: (1) 30% of total revenue, (2) $1 million,

---

[48]  In computing federal taxable income, federal law during the Years at Issue allowed a business taxpayer a relatively broad deduction for state "income" taxes, as well as other taxes to the extent paid or accrued "in carrying on a trade or business." IRC § 164. Since 1984, Oregon has adopted the federal tax base of "taxable income," subject to Oregon-specific modifications. *See* ORS 317.010(8), (10) (defining "Oregon taxable income" by reference to "taxable income" as determined under the Code). ORS 317.314(1) is one of the Oregon modifications; its effect is to re-include in the tax base (or "add back") a subset of previously deducted taxes paid to other states, namely, those imposed upon or measured by "net income or profits."

(3) the cost of goods sold, or (4) the compensation paid including benefits, subject to a cap. *Id*. §§ 171.101(a), .1012, .1013. The result is the taxpayer's margin. *Id*. § 171.101(a)."

*Graphic Packaging Corp. v. Hegar*, 538 SW3d 89 (Tex 2017), *aff'g on other grounds* 471 SW3d 138 (Tex App 2015).[49]

     Because the issue here turns on the meaning of "net income or profits" as used in the Oregon statute, the court once again turns to the analysis, prescribed in *State v. Gaines*,[50] of statutory text, context and (potentially) any helpful legislative history.[51] 346 Or at 170-71. That analysis first requires the court to determine when the phrase entered Oregon law, in order to establish the relevant date to determine the plain meaning, any technical meaning, and the statutory context. *See Comcast Corp.*, 356 Or at 297 (consulting contemporaneous dictionaries). In this case, the court concludes that the relevant date is 1939, 10 years after the legislature enacted the corporation excise tax. The original 1929 act imposed a tax on "net income," which the act defined as "gross income less the deductions allowed." Or Laws 1929,

---

[49] The court cites the Texas Supreme Court opinion solely for its summary of the operation of the margins tax; neither party has disputed the accuracy of that summary. The court notes that taxpayer cites the Texas Court of Appeals opinion for its conclusion (unaddressed by the Texas Supreme Court) that the margins tax is not an income tax.

[50] Taxpayer cites *Kellogg Sales Co. v. Dept. of Rev.*, 10 OTR 480 (1987), *adh'd to on recons of other issues* 1987 WL 28252, *aff'd on other issues* 307 Or 278, 766 P2d 1029 (1988). That pre-*Gaines* case involved the Michigan "single business tax" as in effect for 1974 through 1981. *Id*. at 486. The judge commented on the "skimpy development of the facts and law" in the parties' briefing on whether the taxpayer was required to add back its payments of Michigan tax. *Id*. at 485 n 3. In agreeing with the taxpayer that the Michigan tax at that time was not measured by or upon "net income or profits" under ORS 317.314, the court relied on the "common meaning of the words" and the "notion of a gain realized after payment of expenses necessary to earn income." *Id*. at 486. Although the court in this case ultimately reaches a similar conclusion below, the court is obliged to develop its analysis according to *State v. Gaines*. The court finds more guidance in the Oregon Supreme Court's opinion in *Keyes v. Chambers et al*, 209 Or 640, 307 P2d 498 (1957), which analyzed the meaning of "net income taxes" for purposes of computing a resident individual's right to a credit for taxes paid to another jurisdiction. There, the court looked to the statutory definition of "net income," which also served as the tax base for the personal income tax at that time. *Id*. at 647; *see* Or Laws 1947, ch 353, § 2 (allowing credit for "net income taxes"). This court does the same below with respect to this corporation excise tax issue.

[51] The court has examined the limited materials comprising legislative history of the 1939 law but has found nothing that sheds light on this issue. Bill File, HB 458 (1939), available from Oregon State Archives.

ch 427, § 2(h). One allowed deduction was for "taxes paid or accrued during the taxable year," with an exception for "taxes on income or profits" paid to another state. Or Laws 1929, ch 427, § 8(c). This language remained unchanged until 1939, when the legislature rewrote significant portions of the deduction statute, including by amending the exception to apply to other states' "taxes upon or measured by net income or profits ***." *Compare* Oregon Code, title LXIX, ch XIII, § 69-1308(c) (1930) *with* Or Laws 1939, ch 489, § 4.[52] Despite other substantial changes to the corporation excise tax, the quoted phrase, and its effect as an addback requirement,[53] have remained unchanged as the principal test to determine whether a tax that a corporation has paid to another state is included in, or excluded from, the Oregon tax base.

     The court thus seeks to determine the plain meaning of "net income or profits" as of 1939. The court also looks for any meaning that the phrase may have had as a term of art at that time. If the plain meaning differs from any technical meaning, the court will attempt to determine whether the legislature intended one or the other. *See State v. McNally*, 361 Or 314, 321-22, 392 P3d 721 (2017) (examining plain and technical legal meanings of "passive resistance"; finding same meaning in both contexts); *DCBS v. Muliro*, 359 Or 736, 745-46, 380 P3d 270 (2016) (examining competing plain and technical legal meanings of phrase "receives *** notice"); *Comcast Corp. v. Dept. of Rev.*, 356 Or 282, 296, 337 P3d 768 (2014) (rejecting reliance on plain meaning of "data transmission services"; looking to contemporaneous publications and other examples of usage in telecommunications field to arrive at technical meaning).

---

[52] Oregon Code, title LXIX, chapter XIII, section 69-1308(c) (1930) was amended three times between 1930 and 1939. *See* Or Laws 1931, ch 273, § 6; Or Laws 1933, ch 33, § 3 (Second Spec Sess); Or Laws 1935, ch 8, § 1 (Spec Sess). None of those amendments made substantive changes to OC 1930 section 69-1308(c).

[53] As noted above, Oregon law since 1983 generally eliminates taxes paid to other states by adopting the federal definition of "taxable income" (determined after the deduction for taxes under IRC section 164). As a matter of logic, the "addback" to "taxable income" under ORS 317.314 is equivalent to the "exception" from the "deduction" to compute "net income" that was in place from 1929 to 1983. *See* Or Laws 1929, ch 427, § 8(c); Or Laws 1939, ch 489, § 4; ORS 317.265(2) (1953); 1983 Or Laws ch 162, §§ 19, 57 (repealing and recodifying, with reference to federal taxable income).

The court has examined the following definitions of "net income" and "profits" in both *Webster's International Dictionary* and *Black's Law Dictionary* in use as of 1939:

"**in'come** \*\*\* That gain or recurrent benefit (usually measured in money) which proceeds from labor, business, or property; commercial revenue or receipts of any kind. The total receipts from any branch of business are known as the ***gross income***. That portion of the receipts which remains after paying wages and for materials is known as ***net income***, which is in turn subdivided into interest on the capital invested and profits over and above this interest, or ***net income*** in the narrowest sense. \*\*\*"

*Webster's New Int'l Dictionary of the English Language* 1258 (2d ed 1935) (italics and boldface in original).

"**NET INCOME.** The profit or income accruing from a business, fund, estate, etc., after deducting all necessary charges and expenses of every kind."

*Black's Law Dictionary* 1239 (3d ed 1933) (boldface and upper case in original).

"**prof'it** \*\*\* **3.** The excess of returns over expenditure in a given transaction or series of transactions; as: **a** The excess of the price received over the price paid for goods sold (115 *Wis*. 261). **b** The excess of the price received over the cost of purchasing and handling, or of producing and marketing, particular goods (3 *Fed*. 566, 569). \*\*\* **4.** Excess of income over expenditure, as in a business or any of its departments, during a given period of time \*\*\*."

*Webster's New Int'l Dictionary of the English Language* 1976 (2d ed 1935) (boldface in original).

"**PROFIT.** The advance in the price of goods sold beyond the cost of purchase. The gain made by the sale of produce or manufactures, after deducting the value of the labor, materials, rents, and all expenses, together with the interest of the capital employed. \*\*\* The excess of receipts over expenditures; that is, net earnings. \*\*\* The receipts of a business, deducting current expenses; it is equivalent to net receipts. \*\*\* An excess of the value of returns over the value of advances. The same as net profits."

*Black's Law Dictionary* 1439 (3d ed 1933) (boldface and upper case in original).

The court finds no significant difference between the regular and legal definitions and concludes that both terms require a subtraction of "all expenses" attributable to the income being measured, whether that income is the gain or price for a particular transaction or all the income from a business. *Webster's* refers to "net income" as the amount remaining after paying the two most common kinds of expenses ("wages" and "materials"), while *Black's* requires deduction of "all necessary charges and expenses of every kind." "Profit" has a range of additional definitions in each source, but in those definitions that the court has selected as relevant in this case the court finds the same essence as in "net income." *Webster's* defines "profit" as the "[e]xcess of income over expenditure"; the other definitions are variations on this theme. *Black's* requires deduction of "the value of the labor, materials, rents, and all expenses" as well as the cost of capital. Although the definitions list different kinds of costs that might generate deductions (labor, materials, goods sold, rents, interest), none of the definitions suggests that limiting deductions to only a subset of the expenditures actually incurred and attributable to the revenue, or limiting the deductions to only a specific percentage or fixed dollar amount of the expenditure on these items, would lead to a result within the definition of "net income" or "profit." The court now will use "net income" to refer to both terms.

Based on the statutory text, as explicated by the foregoing definitions, the court tentatively concludes that the Texas margins tax, as applied to taxpayer, is not a tax on or measured by "net income." The margins tax allows a deduction for specified costs of goods sold, or specified compensation, but not both. In any event, deductions are capped at 70 percent of total revenue or total revenue minus $1 million, whichever is less. These limitations are contrary to the concept in the dictionary definitions that all expenses attributable to gross income must be subtracted to arrive at "net income."

Turning to the statutory context, the court finds that the best insights on the meaning of "net income" are the legislature's own words. As of 1939, "net income" had been the measure of the Oregon tax base for 10 years, not only for

the corporation excise tax, but also for the personal income tax, both of which were enacted in 1929. *See* OCLA § 110-1506(a) (imposing on corporations "an excise tax according to or measured by its net income");[54] OCLA § 110-1605 (imposing personal income taxes and surtax on "net income"). Both taxes started with "gross income," broadly defined, reduced by approximately 10 major categories of deductions. *See* OCLA § 110-1506(c) (corporate tax) (defining "gross income" as including "gains, profits and income derived from the business, of whatever kind and in whatever form received"); OCLA § 110-1603(1) (personal tax) (defining "gross income" as including "gains or profits, and income derived from any source whatever"). The allowed deductions included all compensation (subject only to the "reasonableness" limitation to prevent abuse), interest, various types of losses, and depreciation and depletion. *See generally* William H. Kinsey, *Comparison of the Oregon Personal and Corporation Income-Tax Laws with the Federal Income-Tax Law: Part I*, 29 Or L Rev 120, 131-47 (1949-50) (comparing deductions). Costs of goods sold were not on the list of deductions but were nevertheless excluded from the tax base because only the "gain" upon sale constituted "gross income."[55] In that respect both Oregon taxes essentially replicated the federal Internal Revenue Code of 1939, which likewise used "net income" as its tax base, treated "gain" as part of "gross income," and allowed a dozen or so categories of "deductions" generally corresponding to Oregon's. *See* 26 USC § 111 (1939).

The table below shows the principal deductions allowed to corporations and individuals for purposes of computing "net income" under Oregon and federal law as of 1939, with reference to selected parts of the text for comparison purposes.

---

[54] The 1940 edition of the Orgon Compiled Laws Annotated (OCLA), cited in this order, incorporates 1939 law changes, including Or Laws 1939, ch 489, which amended the corporation excise tax law of 1929.

[55] "Gain" was the "amount realized" less the taxpayer's "basis" in the goods, which generally was the "cost" to the taxpayer. *See* OCLA § 110-1512 (corporate tax) (defining "gain from the sale or other disposition of property" as "the excess of the amount realized therefrom over the adjusted basis," the starting point for which was "the cost of the property"); OCLA § 110-1608 (personal income tax) (same).

| Type | Oregon Corporation Excise Tax Deductions as of 1939 (OCLA § 110-1508) | Oregon Personal Income Tax Deductions as of 1939 (OCLA § 110-1611) | Federal Deductions as of 1939 (26 USC § 23 (1939) |
|---|---|---|---|
| Ordinary and necessary business expenses | "All the ordinary and necessary expenses paid during the taxable year in carrying on business, including a reasonable allowance for salaries or other compensation *** and rentals or other payments required to be made as a condition to the continued use or possession *** of property[.]" | "All the ordinary and necessary expenses, paid during the tax year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation *** and *** rentals or other payments required to be made as a condition to the continued use or possession *** of property[.]" | "All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation ***." |
| Interest | "All interest paid during the taxable year on indebtedness." | "All interest paid during the tax[] year on indebtedness ***." | "All interest paid or accrued within the taxable year on [the corporation's] indebtedness ***." |
| Taxes paid or accrued | "Taxes paid during the taxable year, except (1) Taxes imposed by this act. (2) Taxes upon or measured by net income or profits and imposed by *** any state or territory or taxing subdivision thereof ***." | "Taxes, paid during the tax year, *** except: *** (c) Taxes imposed by this act or by any law of the state of Oregon upon or measured by net income ***." | "Taxes paid or accrued within the taxable year, except (1) Federal income, war-profits, and excess-profits taxes ***; [and] (2) income, war-profits, and excess-profits taxes imposed by the authority of any foreign country or possession of the United States ***" |

| Losses | "Losses sustained during the taxable year and not compensated for by insurance or otherwise, if incurred in business."  "[T]he loss [from the sale or other disposition of property] shall be the excess of the adjusted basis *** over the amount realized." OCLA § 110-1512. | "Losses sustained during the tax year and not compensated for by insurance or otherwise, if incurred in trade or business. *** The basis for determining the amount of deduction for losses *** shall be computed according to the method prescribed for arriving at the adjusted basis ***." | "In the case of a corporation, losses sustained during the taxable year and not compensated for by insurance or otherwise."  "Losses from sales or exchanges of capital assets shall be allowed only to the extent provided in section 117." |
|---|---|---|---|
| **Worthless securities** | "If any debts or securities *** are ascertained to be worthless and charged off within the taxable year and are capital assets, the loss resulting therefrom shall *** be considered as a loss from the sale or exchange, on the last day of such taxable year, of capital assets." | "If any debts or securities *** are ascertained to be worthless and charged off within the tax year and are capital assets, the loss resulting therefrom shall *** be considered as a loss from the sale or exchange, on the last day of such taxable year, of capital assets." | "If any securities *** become worthless during the taxable year and are capital assets, the loss resulting therefrom shall *** be considered as a loss from the sale or exchange, on the last day of such taxable year, of capital assets." |
| **Wagering losses** | No counterpart | No counterpart | "Losses from wagering transactions shall be allowed only to the extent of the gains from such transactions." |
| **Bad debt** | "Debts ascertained to be worthless and charged off within the taxable year ***." | "Debts ascertained to be worthless and charged off within the tax year ***." | "Debts ascertained to be worthless and charged off within the taxable year ***." |
| **The court now turns to the Department** | "A reasonable allowance for the exhaustion, wear and tear and obsolescence of property used in the business [] ***." | "A reasonable allowance for the depreciation, exhaustion, wear and tear and obsolescence of property used in the trade or business ***." | "A reasonable allowance for the exhaustion, wear and tear of property used in the trade or business ***." |

| | | | |
|---|---|---|---|
| **Depletion** | "In the case of mines, oil and gas wells, and other natural deposits *** a reasonable allowance for depletion ***. In the case of timber, a reasonable allowance for depletion ***." | "*** [I]n the case of mines, *** oil and gas wells, other natural deposits and timber, a reasonable allowance for depletion[.]" | "In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements ***." |
| **Pension trust contributions** | No counterpart | No counterpart | "An employer establishing or maintaining a pension trust *** shall be allowed as a deduction *** a reasonable amount transferred or paid into such trust during the taxable year in excess of such contributions ***." |
| **Charitable contributions** | "Contributions or gifts made within the tax year by the taxpayer to public charities ***." | "Contributions or gifts within the tax year to corporations or associations operated exclusively for religious, charitable, scientific or educational purposes ***." | "*** [C]ontributions or gifts *** to or for the use of *** (2) A corporation, trust, or community chest, fund, or foundation *** organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes or for the prevention of cruelty to children ***." |
| **Net operating loss** | No specific counterpart | No specific counterpart | "*** [T]he net operating loss deduction computed under section 122." |

This context supports the court's conclusion, based on the statutory text, that the 1939 legislature understood a

"net income" tax as one that allowed deductions for a broad range of costs attributable to the relevant income, generally without any dollar or percentage limitations on those deductions, as well as a few other, unrelated expenditures such as charitable contributions. The legislature was keenly aware of the differences among these three taxes, and the legislature also knew that each tax was amended frequently, and separately, which would tend to magnify the differences over time. This implies that the legislature intended to tolerate some variation among taxes classified as imposed on or measured by "net income or profits." The court sees no need to attempt to determine the exact limits of that tolerance here. Whatever those limits are, the court easily concludes that the Texas margins tax exceeds them by substantially limiting deductions for typical business costs such as compensation to workers, the cost of goods sold and other costs.

### 3.   *Conclusion (Issue G)*

The court will deny the department's motion as to this claim.

### H.   *Business Energy Tax Credit and Penalties*

At oral argument, the parties agreed that their differences with respect to each of these issues are purely computational and derivative of the outcome of the other issues in this case. Accordingly, the court denies the department's motion as to these issues and directs the parties to confer so that the terms of the eventual form of judgment reflect agreed computations on these issues.

## III.   CONCLUSIONS

Having analyzed each of the issues in the parties' motions, now, therefore,

IT IS ORDERED that:

(1)   Plaintiff's Motion To Strike Portion of Defendant's Brief Presenting MTC Auditor's Report as Undisputed "Facts" is granted insofar as the court declines to admit the MTC Excerpt into evidence; the motion is denied in all other respects;

(2)  Plaintiff's Motion for Partial Summary Judgment (Apportionment – Audience Factor Issue) (Issue A in the table of issues above) is granted;

(3)  Plaintiff's Motion for Partial Summary Judgment (Business/Nonbusiness Income Issue) (Issue B) is granted as to the dividends and gain from the Vodafone and Time Warner stock. As to gain from the sale of taxpayer's interests in A&E, the motion is denied, with leave to either party to file a new motion that takes into account the statutory and constitutional treatment of the A&E interests as partnership interests;

(4)  Defendant's Motion for Summary Judgment is:

(a)  Denied as to the composition of taxpayer's unitary group (Issue C in the table of issues above);

(b)  Granted in part and denied in part as to the apportionability of other income items (Issue D in the table of issues above). As to the treatment of the dividends and gain from the Vodafone and Time Warner stock as apportionable business income, the motion is denied. As to the treatment, as apportionable or not apportionable, of gain from the sale of taxpayer's interests in A&E, as well as income passing through A&E as a partnership, the motion is denied, with leave to either party to file a new motion that takes into account the statutory and constitutional treatment of the A&E interests as partnership interests. As to the treatment, as apportionable or not apportionable, of other income items not identified in this paragraph, the motion is granted.

(c)  Denied as to taxpayer's claim for sales factor relief (Issue E in the table of issues above), with leave to either party to seek summary judgment on a more complete factual record;

(d)  Denied as to the treatment of net operating loss carryforward deductions (Issue F in the table of issues above);

(e)    Denied as to the deduction or addback of tax paid to other states (Issue G in the table of issues above); and

(f)    Denied as to taxpayer's claims regarding the Business Energy Tax Credit and penalties (Issues H and I in the table of issues above).